CPI OIL & REFINING, INC., Plaintiff,

v.

METRO ENERGY COMPANY, INC., a corporation, et al., Defendants.

Civ. A. No. 81–AR–1334–S.

United States District Court, N.D. Alabama, S.D.

Jan. 28, 1983.

---

Laurence D. Vinson, Jr., Macbeth Wagnon, Jr., Bradley, Arant, Rose & White, Birmingham, Ala., for plaintiff.

Robert H. Loeb, Gordon, Silberman, Loeb, Cleveland & Gordon, Birmingham, Ala., for Bessemer Oil.

Thomas C. Najjar, Jr., Richard D. Greer, Najjar, Najjar, Boyd & Page, Birmingham, Ala., for Allen.

Donald T. Trawick, Birmingham, Ala., for Cartee.

David Johnson, R. David Christy, Birmingham, Ala., for J. Dennis & Metro.

Robert C. Snead, Jr., Birmingham, Ala., for Dennis.

Charles L. Robinson, Thomas E. Walker and Sidney Lavender, Johnston, Barton, Proctor, Swedlaw & Naff, Birmingham, Ala., for Speedway.

## MEMORANDUM OPINION

ACKER, District Judge.

This cause, as to one of the several defendants, Speedway Oil Company, Inc., (Speedway), has been submitted on that defendant's motion for summary judgment. The Court has carefully read and considered the briefs and has heard oral argument on the motion filed by Speedway, which said motion the Court deems re-interposed to the amended complaint after the Court allowed plaintiff, CPI Oil & Refining Inc. (CPI), to amend its complaint. The amendment does no more than to express in formal fashion an alternative theory of liability based on an alleged conversion by Speedway. Before the said amendment the conversion theory had already been argued and was implicit in the complaint.

On motion for summary judgment the facts presented by deposition and affidavit are to be liberally construed against the movant, here Speedway. Giving CPI the benefit of every doubt, the following facts are undisputed. The basic facts appear in the Agreed Summary set forth in the Pre-Trial Order of August 9, 1982 as follows:

*Agreed Summary.* In June-August, 1981, plaintiff CPI, then known as Beaumont Oil Company and having offices in Beaumont, Texas, was engaged in the business of marketing petroleum products and had in effect an exchange arrangement with Union Oil of California pursuant to which Beaumont Oil and its customers were authorized to withdraw petroleum products from a Union Oil terminal at Powderly, in Jefferson County, Alabama. During the same period, defendant Metro Energy, with offices in Jefferson County, Alabama, was engaged in the business of buying and selling petroleum products. Beaumont Oil arranged for Union Oil to issue a magnetically coded access card to Metro Energy, by means of which Metro Energy could make unsupervised withdrawals of petroleum products from the Union Oil terminal at Powderly. Defendant James Dennis was the president and sole stockholder of Metro Energy.

In addition, the following facts have not been controverted, and thus, for the purpose of summary judgment consideration, are undisputed:

1. Speedway is a corporation organized and existing under the laws of the State

of Alabama and has been such since 1975. (Deposition of Wells, p. 6).

2. Speedway engages in the business of wholesale and retail sale of gasoline and diesel fuel primarily in Alabama with its principal office in Tuscaloosa, Alabama. (Affidavit of Wells, p. 1).

3. Speedway's first purchase of motor fuel from defendant Metro Energy Company, Inc. (Metro) occurred on December 4, 1980. (Deposition of Wells, p. 14). In other words, its relationship with Metro was one of long standing before the transaction complained of. Between December 4, 1980, and June 30, 1981, Speedway purchased approximately 4.6 million gallons of motor fuel from Metro. (Exhibit A–1 to deposition of Wells).

4. Speedway purchased fuel from other sources during this same period. Speedway's customary business practice was to purchase fuel based purely on price considerations at the time of the purchase. (Affidavit of Wells, pp. 1–2; deposition of Wells, pp. 23–25).

5. During an eight day period, August 6 to 13, 1981, Speedway bought 591,927 gallons of fuel from Metro and withdrew it from CPI's fuel at the storage facility of Union Oil at Powderly, using Metro's magnetic access card furnished it by CPI. This method of withdrawal was routine and customary. (Affidavit of Wells, p. 3).

6. Speedway paid for all fuel which it purchased from Metro within 10 days from the time it was delivered to Speedway. This includes the fuel here involved. (Affidavit of Wells, p. 2).

7. Speedway's average sales volume was 1.5 million to 2 million gallons per month, so that the purchases from Metro August 6–13, 1981, was not of an unusual amount. (Deposition of Wells, p. 41).

8. Speedway resold the fuel which it purchased from Metro during the eight day period in its usual course of business to its regular customers at a mark up of two and one-half cents per gallon. (Affidavit of Wells, p. 3, deposition of Brown, pp. 37–38). Speedway's usual business practice is to maintain this mark up of two and one-half cents per gallon. (Deposition of Brown, p. 29). Speedway's gross profit per gallon on the motor fuel it purchased from Metro for resale during the eight day period was no greater than on the motor fuel it purchased from other sources during the same time period. (Deposition of Brown pp. 37–38).

9. Speedway's management was aware that defendant James H. Dennis (Dennis) had a criminal record at the time of the purchases here involved. (Deposition of Wells, p. 65, deposition of Brown, pp. 18–21, 28).

10. Metro's credit limit from CPI was $100,000, both prior to and during the eight days in question. However, on at least one occasion prior to the period in question, Metro had exceeded this $100,000 credit limit, had been "cut off" by CPI but had subsequently been "put back on" by CPI. (Deposition of Dinkle, pp. 42–43).

11. The Metro sale to Speedway here under scrutiny was at a price less than the price of some other suppliers at the time. However, Metro did not offer the 1% discount if payment were made within 10 days, as other suppliers offered, and Metro was firm in its requirement of payment within 7 days. (Deposition of Wells pp. 34, 39). Therefore, some of the price differential can be attributed to the difference in the terms. (Deposition of Wells, p. 49).

12. There is no direct evidence that Speedway or anyone associated with Speedway had knowledge that Metro would fail to pay or intended not to pay CPI for the fuel which Speedway drew from the Union Oil terminal. Speedway's management categorically denies such knowledge. CPI's claim (as stated in Plaintiff's Position in the Pre-Trial Order) that Speedway had "knowledge that Dennis and Metro were engaged in a scheme to defraud, aided and abetted the scheme by furnishing trucks and drivers needed to accomplish withdrawal of large volumes of produce from the Union Oil terminal over a short space of time, before Beaumont Oil became aware of the

magnitude of such withdrawals, for the purpose of obtaining petroleum products at reduced prices for Speedway's own use and for resale", is based entirely on CPI's hopeful inferences. It is these hopeful inferences with which the Court must deal.

*The Alleged Participation in a Fraudulent Scheme.*

■ In order to determine whether or not a genuine issue of material fact exists in this case, the first inquiry must be whether or not CPI has offered any significant probative evidence of Speedway's participation in the alleged conspiracy or scheme by Metro/Dennis for defrauding CPI. It is possible to concede *arguendo* that Speedway *unknowingly* "aided and abetted" the alleged fraudulent transaction by its buying and transporting approximately one half of the 1,070,000 gallons which Dennis/Metro allegedly misappropriated. This does not answer the question, however, as to whether or not Speedway had enough information for it to *know* that Dennis/Metro had a fraudulent purpose and therefore that Speedway was a knowing participant. There is nothing in the depositions of Wells or Brown, the president and sales manager, respectively, of Speedway, which can logically lead to the conclusion that Speedway was a knowing participant. CPI's entire argument is based on what it says are inferences to be drawn from the depositions of B. Mason and R. Mason, the president and vice-president, respectively, of Romaco, Inc., one of Speedway's competitors. These depositions reflect a highly competitive petroleum market where a price differential of one half cent a gallon could be enough to persuade a distributor to shift from one refiner to another. Just prior to the subject purchases by Speedway from Metro the refiner which, according to CPI's contention, quoted the lowest price to Speedway was Crown Central, with deliveries from its terminal in Birmingham. (Deposition of Wells, p. 35). On August 7, 1981, Dennis telephoned Speedway and offered Metro's fuel at 2 cents and 2½ cents per gallon below Crown's current price, also to

be delivered from a Birmingham terminal. (Deposition of Wells, p. 34; deposition of Brown, pp. 34–36). Despite this differential, Speedway declined the offer. Metro then dropped its price lower, after which Speedway agreed to Metro's price and began to withdraw fuel from the Union Oil terminal using the magnetic coded access card furnished it by Metro. The earmarks of arms length bargaining were present.

From these facts, CPI would have the trier of the facts conclude: "it also was abnormal for Metro to offer a product 4½–5½ cents below the lowest price offered by any refiner in this area, that a knowledgable and informed wholesale distributor such as Speedway had to be aware that the transaction was not legitimate", especially when Speedway had prior knowledge that Dennis had a criminal record. It is the "logic" of this argument which must be looked at on motion for summary judgment. The court's viewpoint on summary judgment consideration is different but not entirely dissimilar from the viewpoint which the Court would take in a case on motion for directed verdict on the same evidence. The Fifth Circuit in *Boeing Company v. Shipman*, 411 F.2d 365 (1969), announced the "reasonable man test" as follows:

> On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence—not just the evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that *reasonable and fair-minded men in the exercise of impartial judgment* might reach different conclusions, the motions should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present

a question for the jury. The motions for directed verdict and judgment n.o.v. should not be decided by which side has the better of the case, nor should they be granted only when there is a complete absence of probative facts to support a jury verdict. There must be a conflict in substantial evidence to create a jury question. However, it is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses. (emphasis supplied).

This Court does not believe that *reasonable and fair minded men* on the undisputed facts in this case, could conclude that Speedway knowingly participated in Metro's scheme. If they did they would not be reasonable and fair minded men and women.

One of the purposes of Rule 56 F.R.Civ.P. is to "head off at the pass" unproductive litigation before the time and resources of the court and of the parties are unnecessarily used. *See* Clark and Samenow, *The Summary Judgment,* 38 Yale L.J. 423 (1929). Here CPI has come forward with everything it has, has fired all of its guns after abundant opportunity for discovery and only offers two pieces of evidence to suggest guilty knowledge by Speedway: (1) a lower than market price; and (2) prior knowledge of some undefined criminal conviction of the president of its vendor. On these two items alone, CPI bases its claim of complicity in fraud by Speedway.

The mere fact that Speedway bought fuel at a favorable price, which is certainly something any prudent businessman would do, does not permit a reasonable inference of criminal intent by the purchaser. If a person is offered a new Cadillac having a sticker price of $25,000 at a price of $1,000, there is obviously an arguable inference of knowledge by the purchaser that the Cadillac is stolen. Applying the Cadillac analogy to this situation, Metro's offer is more like the $25,000 Cadillac is being offered for $22,500, a price differential which recognizes what everybody knows, namely, that

there is plenty of room for mark downs by vendors, without eliminating profit enough to go around for everyone in the chain. There is no evidence here that Metro sold for less than it bought from CPI.

The mere fact that Speedway knew that Dennis had been convicted of some undescribed crime does not permit a reasonable inference that Speedway knew that Dennis was committing a crime when he sold fuel to Speedway. For aught appearing Speedway knew of Dennis' record when it bought from Metro before August 6–13, 1981. Is CPI arguing that those purchases were voidable? It is hardly logical to assume that every person convicted of a crime is thereafter presumed to be guilty of larceny in all of the commercial transactions in which he is involved.

Even in combination these two facts can form no more basis for deducing intent by Speedway to participate in a theft than each taken separately. Two *non sequiturs* don't make one *sequitur.* While *scienter* is often proven by circumstantial evidence, there must be a chain of facts which can *logically* lead to the conclusion that the accused party had the *scienter* or actual knowledge which is a necessary element of this cause of action. CPI's argument simply doesn't hold together. There are not enough solid pieces in its "would be" jig saw puzzle to do more than to create a suspicion in its own mind, which yearns understandably for a deep pocket.

Judicial economy and fairness to all parties calls for the granting of summary judgment for an absence of probative evidence of scienter without awaiting a lengthy trial with its inevitable directed verdict or judgment n/o/v.

CPI cites the following 6 criminal cases for the proposition that in order to establish Speedway's liability for aiding and abetting a fraudulent scheme it is sufficient "that Speedway was aware of enough to put a reasonable person with Speedway's knowledge of the wholesale petroleum market on notice that some type of fraudulent scheme was underway". *Loftus v. U.S.,* 46 F.2d 841 (7th Cir.1931); *Williams v. U.S.,* 308 F.2d

664 (9th Cir.1962); *People v. Schroeder,* 264 Cal.App.2d 217, 70 Cal.Rptr. 491 (Cal.App. 1968); *People v. LaValley,* 7 Ill.App.3d 1051, 289 N.E.2d 45 (Ill.App.1972); *State v. Thibodeaux,* 317 A.2d 172 (Me.1974); *Brown v. State,* 281 So.2d 924 (Miss.1973). None of these cases is sufficiently similar to the instant case to undermine the reasoning of the Court above expressed or to persuade the Court that CPI has presented enough facts from which to impute actual knowledge to Speedway of Dennis' alleged fraudulent scheme. To the contrary, this Court is persuaded by the logic of the Ninth Circuit in *ALW, Inc. v. United Airlines, Inc.,* 510 F.2d 52, 55 (9th Cir.1975) as follows:

> Once the allegations of conspiracy made in the complaint are rebutted by probative evidence supporting *an alternative interpretation of a defendant's conduct,* if the plaintiff then fails to come forward with specific factual support of its allegations of conspiracy, summary judgment for the defendant becomes proper. (emphasis supplied).

As is already apparent, this Court takes the view that there is no evidence to support plaintiff's "interpretation of defendant's [Speedway's] conduct". If, *arguendo,* CPI's bare allegations are considered, *initially,* as true, they are certainly rebutted by logical alternative explanations of Speedway's conduct which comport with everyday common sense.

Instead of specific factual support for its allegations, CPI's "inferences" from facts can be described only as the wishful thinking of an advocate. This is even more true when the entire transaction is considered in the light of the Uniform Commercial Code and of the public policy which it represents in the world of commercial transactions, something which the Court will discuss *infra.*

Upon the foregoing reasoning it becomes unnecessary for the Court to rule upon or to discuss Speedway's contention that CPI is estopped by its own conduct from claiming against Speedway for Speedway's buying and paying for what CPI had placed Metro in a position to sell to Speedway by the free use of CPI's magnetic card, 24 hours a day, 7 days a week.

*Plaintiff's Conversion Theory*

■ CPI has a "fall back" position. It asserts a theory that when Metro exceeded its $100,000 credit limit it began to commit larceny and that Speedway could not thereafter acquire title to stolen fuel, even if Speedway did not know that it was stolen. As to this contention CPI runs into a principle of the law merchant which was a meaningful doctrine covering this type of situation long before the Uniform Commercial Code. The common law had a rule called *market overt.* Blackstone describes it in his Commentaries at Book II, at page 449 in Chapter 30 on The Rights of Things, as follows [using modern English]:

> But property may also in some cases be transferred by sale, though the vendor has no title or interest at all in the goods: for it is expedient that the buyer, by taking proper precautions, may at all events be secure of his purchase; otherwise all commerce between man and man must soon be at an end. And therefore the general rule of law is, that all sales and contracts of any thing vendible, in fairs or markets *overt,* (that is, open) shall not only be good between the parties, but also be binding on those that have any right or property therein.

In 1936 W.S. Holdsworth wrote his massive treatise entitled *A History of English Law.* In his second edition, Volume IV at page 522, Holdsworth says:

> With the rule of the law merchant that a sale of goods in market overt passes the property to a purchaser, even though the vendor had no title to them, I shall deal when I come to consider the development of the law merchant during this period. We shall see that at this period, if not earlier it had become a part of the common law. But in the case of stolen goods it was subject to the right of the owner to get a writ of restitution if he had procured the conviction of the thief. . . .

The easily voiced maxim that a thief cannot pass good title is recited in *Geneva Gin & Storage Co. v. Rauls,* 240 Ala. 320, 199 So.

734 (Ala.1941), relied upon by CPI. If followed to a logical conclusion, this maxim would undermine the private property expectations of purchasers in the open market place, even as to fungible goods mixed into the purchaser's inventory. This problem was legislatively dealt with after *Geneva Gin* and resolved by the draftsmen of the Uniform Commercial Code, adopted in Alabama at Alabama Code (1975) §§ 7–1–101 *et seq*. The *market overt* concept of the common law is included where the goods being sold are ostensibly owed by the vendor. The United States District Court for Minnesota has considered whether or not motor fuel falls within the UCC's definition of "goods" and ruled: "Certainly the motor fuel gasoline and fuel oil covered by the contract in issue falls properly under this definition. The UCC controls this case." *Oakey Gasoline and Oil Co., Inc. v. OKC Refining, Inc.*, 364 F.Supp. 1137, 1141 (D.Minn.1973). The transactions here are specifically controlled by § 7–2–403(1) Code of Alabama (1975), which reads in pertinent part:

(1) A purchaser of goods acquires all title which his transferor had *or had power to transfer* except that a purchaser of a limited interest acquires rights only to the extent of the interest purchased. A person with voidable title has power to transfer a good title to a good faith purchase for value. *When goods have been delivered under a transaction of purchase the purchaser has such power even though*

\*　　\*　　\*　　\*　　\*　　\*

(d) *The delivery was procured through fraud punishable as larcenous under the criminal law.* (emphasis supplied).

The Fifth Circuit explained the policy underlying § 7–2–403 in *In re Sammuels & Co.*, 526 F.2d 1238, 1242 (5th Cir.1976), *cert. denied*, 429 U.S. 834, 97 S.Ct. 98, 50 L.Ed.2d 99 (1977), where it stated:

Section 2–403 gives certain transferors power to pass greater title than they can themselves claim. Section 2–403(a) gives good faith purchasers of even fraudulent buyers-transferors greater rights than the defrauded seller can assert. This harsh rule is designed to promote the greatest range of freedom possible to commercial vendors and purchasers.

It is an uncontroverted fact that the delivery of the motor fuel from CPI to Metro was under a transaction of purchase. The Fifth Circuit in *American Standard Credit, Inc. v. National Cement Co.*, 643 F.2d 248, 268 (5th Cir.1981), examined the phrase "transaction of purchase" in a case very similar in its facts and offered the following example in explanation:

For the seller to have obtained even voidable title he must have obtained delivery of the goods through "a transaction of purchase." While this phrase has been defined broadly by various courts, it is generally limited to those situations in which the party who delivered the goods to the subsequent seller intended, however misguidedly, that the seller would become the owner of the goods. Thus, the con artist who fraudulently induces a manufacturer to deliver goods to him by means of a forged check has voidable title because he obtained delivery through a transaction of purchase, even though the defrauded manufacturer could bring criminal charges against the con artist; under section 2–403(1), the defects in the con artist's voidable title would be cured by a sale to a good faith purchase for value, and the good faith purchaser would obtain clear title, free from any claims of the manufacturer.

In its complaint CPI characterizes the transaction as "fraudulent". CPI in its memorandum brief describes the transaction as "larceny by trick". If the transaction by Metro constituted "larceny by trick", according to the Official Comment to § 7–2–403, "larceny by trick" was intended to be included in the exception set forth in subsection (1)(d). The cases relied upon by CPI, including *Geneva Gin* are not applicable to the facts in this case, not only because they do not deal with the UCC but because in none of them was the thief placed by the plaintiff in possession and control of plaintiff's property, together

with a right to sell the property to a third party. It is this distinguishing feature which prevents CPI from successfully imposing liability on Speedway for conversion, that is, unless it demonstrates actual knowledge by Speedway of a theft by Metro, something which the Court has already concluded that CPI has failed to do.

An appropriate order is being entered contemporaneously.