GARY M. NEUGENT, PLAINTIFF/COUNTERDEFENDANT, AND CINDY P. NEUGENT, COUNTERDEFENDANT V. BEROTH OIL COMPANY, 4 BROTHERS FOOD STORE, LTD., VERNICE V. BEROTH, JR., AND WALTER BEROTH, DEFENDANTS

No. COA01-242

(Filed 5 March 2002)

**1. Sales— wholesale motor fuel—sale of goods—governed by UCC**

The sale of motor fuel by a jobber, distributor, or oil company to a dealer is a "sale of goods" governed by the UCC.

**2. Sales— wholesale motor fuel—oral contract—not shown**

Plaintiff failed to meet his burden of showing that an oral contract for motor fuel was entered into at a meeting where, presuming that an offer was made, the evidence shows that it was not accepted and that it lapsed well before the date defendant began supplying plaintiff with motor fuel. N.C.G.S. § 25-2-204.

**3. Sales— wholesale motor fuel—breach of contract—unexpected freight charge**

In a contract action arising from the transfer of a service station and its motor fuel supply agreement, summary judgment was properly entered for defendants as to plaintiff's breach of contract claims regarding the prices defendant charged during an interim period. Bare allegations of an unexpected freight charge do not state a claim for breach of the implied covenant of good faith under N.C.G.S. § 25-2-305.

**4. Sales— wholesale motor fuel—pricing—issues of fact**

There were genuine issues of material fact concerning the breach of a contract to supply motor fuel to a service station

where the plain, clear, and unambiguous language of the dealer service agreement established a pricing formula which created an expectation by plaintiff and an obligation by defendant that plaintiff could purchase motor fuel at the same price as every other Amoco dealer supplied by defendant in defendant's "pricing area." The size and location of the pricing area during the relevant period, the number of other independent dealers inside the pricing area that defendant sold to as an Amoco dealer, the price that defendant charged others for motor fuel, and whether stations which defendants owned were located in the pricing area were all issues of fact.

**5. Fraud— facilitation—wholesale motor fuel—summary judgment**

The trial court erred by granting summary judgment for defendant on plaintiff's civil conspiracy claim. North Carolina recognizes a cause of action for facilitating fraud and plaintiff presented evidence that service stations owned by defendants and located near plaintiff's station sold motor fuel to the public at a price lower than that at which defendant sold fuel to plaintiff.

**6. Statutes of Limitation and Repose— wholesale motor fuel—fraud—conspiracy—unfair trade practices—breach of contract**

In an action arising from the sale of a service station and a motor fuel sales agreement, defendants' statute of limitations claim did not preclude plaintiff's contract claims that accrued on or after 1 December 1995 where plaintiff filed his complaint on 25 June 1999, well within the required four-year period. The dates that fraud and conspiracy claims and unfair and deceptive trade practice claims began to run could not be determined from the record and presented genuine issues of material fact.

**7. Corporations-corporate veil— summary judgment erroneous**

Defendants were not protected by the corporate veil from claims of fraud, unfair and deceptive trade practice, and conspiracy arising from the transfer of a service station and a motor fuel pricing agreement.

**8. Contracts— ratification—motor fuel pricing formula**

Plaintiff did not ratify defendant's pricing of wholesale motor fuel where plaintiff did not bring suit until 3 years after he learned of an unexpected freight charge and only when plaintiff was in

default, but awareness of the freight charge is inconclusive. Plaintiff did not have full knowledge of all material facts concerning the elements of the formula.

Appeal by plaintiff/counterclaim-defendants from summary judgment entered 23 October 2000 by Judge Russell G. Walker, Jr. in Forsyth County Superior Court. Heard in the Court of Appeals 5 December 2001.

*Michelle D. Reingold, for plaintiff/counterclaim-defendants-appellants.*

*Hendrick Law Firm, by T. Paul Hendrick and Matthew H. Bryant, for defendants-appellees.*

TYSON, Judge.

Gary M. Neugent ("plaintiff") appeals from the trial court's order granting Beroth Oil Company, 4 Brothers Food Store, Ltd., Vernice V. Beroth, Jr., and Walter Beroth (collectively "defendants") summary judgment on plaintiff's claims, and plaintiff and Cindy P. Neugent, counterclaim-defendant, appeal from the trial court's order granting Beroth Oil Company summary judgment on its counterclaim. We affirm in part, and reverse and remand in part.

## I. Facts

Prior to 1986, Amoco Oil Company ("Amoco") constructed a motor fuel station at 831 South Main Street in Kernersville on land it leased from Mr. Peddycord. In 1986, Amoco leased the improvements to plaintiff (the "Amoco lease"). Plaintiff purchased motor fuel directly from Amoco through an Amoco dealer supply agreement ("Amoco DSA"). The Amoco DSA and lease were renewed 1 November 1993 for three additional years. The Amoco DSA established the motor fuel's price at "Amoco's dealer buying price." Amoco's dealer buying price ("DBP") is a formula price term, which allows Amoco to adjust prices in response to the commercial dynamics in the market place. The Amoco DSA also provided that "[i]f this Agreement is assigned by **Amoco** to an **Amoco** jobber, the prices to be paid by **Dealer** for motor fuel and other products hereunder shall be as established by said jobber." (Emphasis in original). "Jobber" is a term of art in the motor fuel industry used to describe an intermediate distributor who sells motor fuel to other dealers rather than directly to consumers.

NEUGENT v. BEROTH OIL CO.

[149 N.C. App. 38 (2002)]

Beroth Oil Company, Inc. ("Beroth") operates as an Amoco motor fuel jobber in Forsyth and other North Carolina counties. Sometime between August of 1994 and February of 1995, Beroth purchased the land from Mr. Peddycord and took assignment of the land lease with Amoco. Beroth is a North Carolina corporation organized 13 June 1986. Vernice and Walter Beroth, and two other brothers, are shareholders and officers.

Vernice and Walter Beroth are also shareholders and officers of another North Carolina corporation organized 9 January 1985 named 4 Brothers Food Store, Ltd. ("4 Brothers"). All twenty-seven 4 Brothers stores sell Amoco motor fuel. Some of the 4 Brothers stores are located in Kernersville where the Amoco station plaintiff operated was located.

During 1994, Amoco decided to sell its retail motor fuel stations in North Carolina. Plaintiff testified in deposition that "[e]arly in 1994, Amoco decided to pull out of its locations in North Carolina." Amoco's dealer leases provided that if Amoco ever decided to sell its stations, its lessees would have the first opportunity to purchase. Amoco notified its lessees that they could exercise their "rights of first refusal" and purchase Amoco's stations. Plaintiff stated that "they [would] have to give me first—right of refusal, and I [would] have 30 days to exercise it . . . ." Amoco also provided its jobbers the opportunity to bid on and purchase the stations, if the lessees did not exercise their rights and purchase.

In October of 1994, Vernice and Walter Beroth and plaintiff met to discuss whether plaintiff would be interested in purchasing Amoco motor fuel from Beroth rather than directly from Amoco. What was actually said at the meeting is disputed, but all parties agree that Beroth's pricing of Amoco motor fuel was discussed. Walter and/or Vernice Beroth mentioned the price of "6¢ over Beroth's cost." The two parties interpreted the word "cost" differently. Plaintiff understood that "cost" meant the price Beroth purchased motor fuel from Amoco, known as the "rack price," and Vernice and Walter Beroth understood that "cost" meant the rack price plus tax and freight charges.

After the 1994 meeting, plaintiff decided not to become a Beroth dealer and decided to exercise his "right of first refusal" contained in his Amoco lease and to purchase the station from Amoco. By December of 1994, plaintiff was unable to complete the purchase of

the station from Amoco. Plaintiff testified that his "financing fell through."

After plaintiff failed to purchase the station, Beroth, as one of Amoco's jobbers, bid on and purchased the station, assumed the Amoco lease and the Amoco DSA sometime in December of 1994. The Amoco lease and the Amoco DSA were due to expire 31 October 1996.

On or about 18 January 1995, Beroth began supplying Amoco motor fuel to plaintiff. The motor fuel was sold to plaintiff under an electronic meter marketing plan. Beroth delivered motor fuel to the station's underground storage tanks, which Beroth owned and maintained, on consignment. Beroth retained title to the motor fuel in the storage tanks until it was sold to the consumer through metered fuel pumps. At that time, Beroth established the price it charged to plaintiff. Beroth billed plaintiff on Monday, Wednesday and Friday. Beroth normally delivered motor fuel twice a week.

Plaintiff remained a Beroth dealer, selling Amoco motor fuel until 27 May 1999. From about 18 January 1995 until 30 November 1995, Beroth and plaintiff operated under the plaintiff's Amoco lease and Amoco DSA that Beroth acquired when it purchased the station from Amoco. Plaintiff understood that he would "operate on Amoco's lease until Beroth . . . came up with a lease . . . ."

In the fall of 1995, plaintiff received a draft of a proposed lease and dealer supply agreement from Beroth's attorney. Plaintiff and his counsel reviewed the agreements, and plaintiff signed a new lease ("Beroth lease"), a new dealer supply agreement ("Beroth DSA"), and an unlimited absolute guaranty effective 1 December 1995. Cindy P. Neugent signed the guaranty only on 23 February 1996.

On or about 4 July 1996, plaintiff claims to have discovered that Beroth had been billing him for a freight charge of 1.427 cents per gallon delivered in addition to the rack price plus six cents per gallon. Plaintiff never notified Beroth of his dissatisfaction with the price and continued to accept, sell, and pay for Amoco motor fuel sold by Beroth.

On 31 December 1998, the Beroth lease and the Beroth DSA expired, and plaintiff failed to renew. On 1 January 1999, plaintiff became a hold-over tenant. Plaintiff paid Beroth rent for January and February, but failed to pay rent for March, April, or May 1999. Plaintiff also failed to pay Beroth for motor fuel he purchased from 10 through 17 May 1999.

## NEUGENT v. BEROTH OIL CO.

[149 N.C. App. 38 (2002)]

Beroth notified plaintiff in writing of his default on 11 March 1999, and plaintiff vacated the property on 27 May 1999. Beroth applied plaintiff's deposit of $13,000.00 and a $541.00 credit for returned stock toward past due amounts. Plaintiff and Cindy P. Neugent, counterclaim-defendant, claim that plaintiff deposited approximately $17,000.00, and this remains a disputed issue of fact. A letter from Beroth's counsel to plaintiff dated 22 June 1999 demanded remaining past due rent and payment for motor fuel in the amount of $16,768.95. Plaintiff responded by filing suit on 25 June 1999 alleging (1) breach of contract, (2) civil conspiracy, (3) fraud, (4) punitive damages, and (5) unfair and deceptive trade practices.

Defendants answered denying all allegations and affirmatively pled the defenses of (1) Statute of Frauds, (2) Statute of Limitations, (3) assumption of the risk, (4) frivolous action, (5) frivolous punitive damage claim, (6) unclean hands, (7) waiver, (8) failure to mitigate, (9) plaintiff's breach, and (10) the Petroleum Marketing Practices Act, 15 U.S.C.S. § 2802 et seq. on 16 August 1999. Only Beroth Oil Company counterclaimed for past due rent and motor fuel payments and named Cindy P. Neugent as a counterclaim-defendant.

On 27 September 1999, defendants amended their answer to add the additional affirmative defenses of (11) G.S. § 25-2-607, (12) corporate veil, (13) estoppel, (14) failure of consideration, (15) rejection of offer, (16) ratification, and (17) G.S. § 25-2-202. On 26 October 1999, plaintiff and counterclaim-defendant replied to Beroth's counterclaim and affirmatively pled the defenses of (1) duress, (2) failure of consideration, (3) fraud, (4) illegality, and (5) payment. Defendants moved for summary judgment.

The trial court entered judgment for defendants on all of plaintiff's claims and granted judgment for Beroth on its counterclaim in the amount of $15,826.89 for past due rent and motor fuel, attorney's fees of $2,374.03, prejudgment interest of $1,852.90, and costs of $3,892.63 on 23 October 1999. Plaintiff and counterclaim-defendant appeal. Defendants did not cross-appeal.

## II. Issues

Plaintiff assigns as error the trial court's (A) granting of summary judgment for defendants on plaintiff's claims where disputed issues of material fact exist regarding: (1) breach of contract, (2) fraud, (3) unfair and deceptive trade practices, and (4) civil conspiracy; and (B) granting of summary judgment for Beroth on its counterclaim

because of plaintiff and counterclaim-defendant's meritorious affirmative defenses of (1) duress, (2) failure of consideration, (3) fraud, (4) illegality, and (5) payment.

### III. Breach of Contract

Plaintiff contends that defendants represented and agreed that the price of motor fuel sold to plaintiff would be 6 cents per gallon "above Beroth's cost," and that Beroth "breached this contract by charging Mr. Neugent an additional 1.4 cents per gallon, above Beroth's cost, as a delivery charge."

Plaintiff argues that Walter and/or Vernice Beroth breached an oral contract made at the October 1994 meeting, and also claims that "Beroth breached its . . . . Dealer Supply Agreement signed by the parties . . . ." We address each claim separately.

### A. Motor Fuel as a Sale of Goods

[1] We recognize that these transactions are governed by the Uniform Commercial Code ("UCC"). Article 2 of the UCC, set out in Chapter 25 of the North Carolina General Statutes, governs the sale of goods. " 'Goods' means all things . . . which are movable at the time of identification to the contract for sale . . . ." N.C. Gen. Stat. § 25-2-105(1) (1965). North Carolina Courts have not addressed the issue of whether the sale of motor fuel between a jobber, distributor, or oil company and a dealer constitutes the sale of goods. Other jurisdictions have concluded that the UCC controls these transactions. *Allapattah Servs., Inc. v. Exxon Corp.* 61 F. Supp 2d 1308 (S.D. Fla. 1999) (sale of gasoline by an oil company to its dealers is a sale of goods covered by Article 2 of the UCC); *CPI Oil & Ref., Inc. v. Metro Energy Co.*, 557 F. Supp 958, 964 (N.D. Ala. 1983); *Oakey Gasoline and Oil Co., Inc. v. OKC Ref., Inc.*, 364 F. Supp 1137, 1141 (D. Minn. 1973); *Laudisio v. Amoco Oil Co.*, 108 Misc. 2d 245 (NYS. 1981); *Steiner v. Mobile Oil Corp.*, 569 P.2d 751 (Cal. 1977) (gasoline sold by a supplier to a service station constitutes goods under the UCC). We hold that the sale of motor fuel between a jobber, distributor, or oil company to a dealer is the "sale of goods" governed by the UCC.

### B. Alleged Oral Contract

[2] Plaintiff claims that defendants committed "a material breach of the contract formed in October, 1994" by charging him a 1.427 cents

per gallon delivery charge. We disagree. Viewed in the light most favorable to the plaintiff, the evidence failed to establish that an oral contract was entered into during the October 1994 meeting.

Article 2 of the UCC provides that:

(1) A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by _both_ parties which recognizes the existence of a contract.

(2) An agreement sufficient to constitute a contract for sale may be found even though the moment of its making is undetermined.

(3) Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy.

N.C. Gen. Stat. § 25-2-204 (1965) (emphasis supplied); *see also Custom Molders, Inc. v. Roper Corp.*, 101 N.C. App. 606, 613, 401 S.E.2d 96, *100, disc. review on additional issues denied*, 328 N.C. 731, 404 S.E.2d 867, *aff'd*, 330 N.C. 191, 410 S.E.2d 55 (1991) ("under [the UCC] a contract for the sale of goods may be made in any manner sufficient to show agreement, including conduct that indicates the existence of such a contract") (citing *Carolina Builders Corp. v. Howard-Veasey Homes, Inc.*, 72 N.C. App. 224, 324 S.E.2d 626, *disc. review denied*, 313 N.C. 597, 330 S.E.2d 606 (1985)). "The Uniform Commercial Code applies more liberal rules governing the formation of contracts than the rules applied under traditional common law." *Fordham v. Eason*, 351 N.C. 151, 156, 521 S.E.2d 701, 705 (1999).

When plaintiff's evidence showed only tentative negotiations, it is insufficient to show the existence of a contract for the sale of goods. *Oakley v. Little*, 49 N.C. App. 650, 272 S.E.2d 370 (1980). "A contract binding defendant was not made until defendant did some act indicating its intent to be bound, *i.e.*, recognized the existence of the contract." *Unitrac, S.A. v. Southern Funding Corp.*, 75 N.C. App. 142, 146, 330 S.E.2d 44, 46 (1985) (citing G.S. § 25-2-204). "[P]laintiff bore the burden of proving all of the essential elements of a valid contract . . . ." *Delp v. Delp*, 53 N.C. App. 72, 76, 280 S.E.2d 27, 30 (1981); *see also King v. Bass*, 273 N.C. 353, 354, 160 S.E.2d 97, 98 (1968) (burden on plaintiff to offer evidence in support of all essential and material elements of claim) (citation omitted).

At bar, plaintiff has failed to meet his burden by showing that an oral contract was entered into during the October 1994 meeting. Plaintiff claims that Walter or Vernice Beroth offered to sell motor fuel to plaintiff at that meeting. Walter and Vernice Beroth claim that no offer was made, simply a discussion of motor fuel prices.

Reviewing the record in the light most favorable to plaintiff, he failed to produce any evidence that he accepted the alleged "offer," other than showing that Beroth: (1) purchased the underlying property from Mr. Peddycord, (2) purchased the station from Amoco, (3) assumed the Amoco lease and Amoco DSA, and (4) began supplying plaintiff motor fuel on or about 18 January 1995. Presuming an "offer" was made, the evidence indicates it was not accepted and lapsed well before 18 January 1995.

Although not definitive, plaintiff's deposition testimony and his conduct after the October meeting indicates no acceptance of Beroth's alleged "offer." Plaintiff stated that "I don't recollect making a comment back to them. I don't remember making a comment back to them. I was just getting—gathering information," and concluded that "I was basically seeking information to try to clarify how much things would change in dealing from Amoco Oil Company direct versus being with Beroth Oil Company."

Also, plaintiff exercised his right of first refusal to the Amoco lease and attempted to purchase the station directly from Amoco after the October 1994 meeting. "I had a meeting with Walter and Thornton [sic] Beroth that—and maybe November or early December [1994], and that's after I had signed that first right of refusal . . . . I told them . . . it was my intentions to, you know, purchase the lease from Amoco." Plaintiff offers no evidence that he intended to be bound, or that he considered any of defendants bound to any alleged oral contract as a result of the October 1994 meeting.

Additionally, UCC § 2-201 requires that "a contract for the sale of goods for the price of five hundred dollars ($500.00) or more is not enforceable . . . unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought . . . ." N.C. Gen. Stat. § 25-2-201 (1965). The record indicates that after Beroth began selling motor fuel to plaintiff, pursuant to the Amoco and Beroth DSA's, the price of motor fuel deliveries were substantially more than $500.00. We hold that no contract was formed between the parties as a result of the October 1994 meeting.

NEUGENT v. BEROTH OIL CO.

[149 N.C. App. 38 (2002)]

## C. Beroth Begins Selling Amoco Motor Fuel to Plaintiff

**[3]** On or about 18 January 1995, Beroth began selling motor fuel to plaintiff. From that date until 30 November 1995, the parties operated pursuant to plaintiff's Amoco lease and Amoco DSA that Beroth assumed when it purchased the station from Amoco. The Amoco DSA set the price for motor fuel at "**Amoco's** dealer buying price . . . in effect in **Amoco's** pricing area in which the above-identified motor fuel sales facility is located at the time when title to said products passes from **Amoco** to **Dealer**." (Emphasis in original). Walter Beroth testified that he did not know "Amoco's dealer buying price." Plaintiff testified that he did not know "the markup in the dealer buying price that Amoco charged . . . ." The Amoco DSA further provided that "[i]f this Agreement is assigned by **Amoco** to an **Amoco** jobber, the prices to be paid by **Dealer** for motor fuel and other products hereunder shall be as established by said jobber." (Emphasis in original). We conclude that Beroth, as jobber-assignee of the Amoco DSA, was not obligated to charge the same price to plaintiff that Amoco had charged for motor fuel according to the clear and unambiguous terms of the Amoco DSA. It is also clear from the record that Beroth and plaintiff did not enter into a new written agreement until 1 December 1995.

Plaintiff understood that he would "operate on Amoco's lease until Beroth . . . came up with a lease," and that he would be bound by its terms. Plaintiff does not argue that no contract existed, only that defendants breached the Beroth DSA that became effective 1 December 1995. Plaintiff does not specifically address the interim period from or about 18 January 1995 to 30 November 1995, when the parties operated under the Amoco DSA, in his brief.

"UCC § 2-305 provides for the determination of the price when the parties intended to make a contract although no price was stated . . . ." 2A Ronald A. Anderson, *Anderson on the Uniform Commercial Code* § 2-305.5, p 431 (3d ed. 1997).

(1) The parties if they so intend can conclude a contract for sale even though the price is not settled. In such a case the price is a reasonable price at the time for delivery if

(a) nothing is said as to price; or

(b) the price is left to be agreed by the parties and they fail to agree; or

(c) the price is to be fixed in terms of some agreed market or other standard as set or recorded by a third person or agency and it is not so set or recorded.

(2) A price to be fixed by the seller or by the buyer means a price for him to fix in good faith.

. . . .

N.C. Gen. Stat. § 25-2-305 (1965) (emphasis supplied).

Here, the Amoco DSA established the price of motor fuel at whatever Beroth, as assignee-jobber, decided to charge. Beroth's discretion was not unlimited: "A price to be fixed by the seller . . . means a price for him to fix in good faith." N.C. Gen. Stat. § 25-2-305(2). " 'Good faith' in the case of a merchant means honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." N.C. Gen. Stat. § 25-2-103(1)(b) (2001). Beroth and plaintiff were both merchants as defined in the UCC. See N.C. Gen. Stat. § 25-2-104 (1965).

Plaintiff does not allege that Beroth did not set the price in good faith during this interim period between about 18 January 1995 and 30 November 1995. We hold that bare allegations of an unexpected 1.427 cents per gallon freight charge, without more, does not state a claim for breach of the implied covenant of good faith during the period of time between about 18 January 1995 to 30 November 1995. We affirm the trial court's grant of summary judgment for defendants as to all of plaintiff's contract claims through 30 November 1995.

### D.  Beroth DSA

[4] Plaintiff claims that defendants breached the Beroth DSA, or alternatively, there is a disputed issue of fact as to whether defendants breached. Plaintiff's main contention is that "Beroth was charging . . . 4 Brothers an amount substantially less than that charged plaintiff." We are unable to determine from the record whether defendants breached the Beroth DSA because genuine issues of material fact exist.

Beroth and plaintiff, each represented by counsel, executed the Beroth lease and DSA effective 1 December 1995. The parties established the price for motor fuel using language that is virtually identical to the language contained in the Amoco DSA. The Beroth DSA stated:

4. **Prices.** The price for motor fuels purchased by **Dealer** from **Beroth** hereunder, shall be **Beroth's** dealer buying price for each respective grade of said products in effect in **Beroth's** pricing area in which the Premises is located at the time when title to said products passes from **Beroth** to **Dealer**.

(Emphasis in original).

As stated above, UCC § 2-305(2) authorizes a seller or buyer to fix the price to be charged. "This is not expressly declared in the Code but is necessarily implied in UCC § 2-305(2) which defines the duty of a party in fixing the price." Anderson, *supra*, § 2-305:44, at 449.

Good faith ordinarily is met if a formula or standard is set. Official Comment 3 of the UCC § 2-305(2) provides that a "price in effect" is by definition a price set in good faith: "in the *normal case* a 'posted price' or a future seller's or buyer's 'given price,' *'price in effect*,' 'market price,' or the like satisfies the good faith requirement." N.C. Gen. Stat. § 25-2-305, Official Comment, para. 3, sent. 3 (emphasis supplied). "This provision apparently reflects a belief that § 2-305(2) should not require suppliers in industries where 'price in effect'-type contracts are often used to establish that the price ultimately charged was a reasonable one." *Wayman v. Amoco Oil Co.*, 923 F. Supp 1322, 1346 (D. Kan. 1996). "[T]he chief concern of the UCC Drafting Committee in adopting § 2-305(2) was to prevent *discriminatory* pricing—i.e., to prevent suppliers from charging two buyers with identical pricing provisions in their respective contracts different prices for arbitrary or discriminatory reasons." *Id.* at 1347 (emphasis in the original). We hold that once a buyer or a seller sets a formula or standard to determine the price in the contract pursuant to UCC 2-305(2), both parties must abide by that formula or standard until mutually amended or changed.

Defendants argue that "Neugent contracted to buy at an open price term—not a fixed price formula." We disagree. "When the parties have agreed on a formula for determining the price, there is no 'open price' term . . . ." Anderson, *supra*, § 2-305:32, at 443 (citing *S.C. Gray, Inc. v. Ford Motor Co.*, 286 N.W.2d 34 (Mich. Ct. App. 1979)). Under the Beroth DSA pricing structure, the price charged by Beroth may change from day to day, but the pricing formula or structure contractually cannot change without amending the agreement. The plain, clear, and unambiguous language of the Beroth DSA establishes a pricing formula which created an expectation by plaintiff and an obligation by Beroth that plaintiff could purchase motor fuel at the same

price as every other Amoco dealer that Beroth supplied Amoco motor fuel to in "Beroth's pricing area."

Alternatively defendants contend that even if they breached a contract, plaintiff's contract claim is barred because defendants affirmatively pled UCC § 2-607, and plaintiffs failed to give defendants required notice after they knew of the breach. N.C. Gen. Stat. § 25-2-607 (1965).

After careful review, we conclude that defendants have failed to show that UCC § 2-607 applies to transactions other than the failure of the "goods or the tender of delivery . . . to conform to the contract." N.C. Gen. Stat. § 25-2-601 (1965). Also, the date of the breach(es), if any, is a disputed issue of fact. We are unable to determine when plaintiff should have discovered that a breach, if any, occurred, triggering the notice requirements of G.S. § 25-2-607.

We hold that the Beroth DSA set the price for motor fuel at "Beroth's dealer buying price . . . in effect in Beroth's pricing area" and utilized a fixed price formula that obligated Beroth to sell to plaintiff at the same dealer buying price that Beroth sold motor fuel to other dealers in "Beroth's pricing area."

Whether or not Beroth charged plaintiff "Beroth's dealer buying price . . . in effect in Beroth's pricing area" from 1 December 1995 to 27 May 1999 is a dispositive issue regarding plaintiff's breach of contract claim. Defendants argue that plaintiff has "no evidence that he [plaintiff] is being charged differently than other dealers." This assertion is unsupported by the record.

Beroth or 4 Brothers owns and operates at least twenty-seven stations in Forsyth and surrounding counties. Walter Beroth admitted in his deposition testimony that "[w]e don't charge ourselves for the product . . . . [4 Brothers] is not really charged over what Beroth is charged for the product." "In other words, there's not a set markup on that product when it's dropped at the store for the store internally." From this and other parts of Walter Beroth's testimony and the record, it is undisputed that Beroth sells motor fuel to the 4 Brother stations at Beroth's "rack price" plus freight only. Beroth charged 4 Brothers a different price than it charged plaintiff for motor fuel.

Walter Beroth contends in his deposition testimony that 4 Brothers is not an Amoco dealer. The record before us does not support his contention. 4 Brothers is a separate corporation.

Approximately twenty-seven 4 Brothers stores sold Amoco motor fuel, supplied by Beroth, to the public. In plaintiff's first request for admissions, defendants admitted that "4 Brothers . . . and Beroth . . . are separate and distinct corporations." Some 4 Brothers stations were located less than three miles from plaintiff's station. Although the record is clear that Beroth charged 4 Brothers less than it charged plaintiff, the record does not show the extent of "Beroth's pricing area," and consequently we are unable to determine if Beroth breached the Beroth DSA.

Vernice Beroth was unable to identify "Beroth's pricing area" conclusively. When asked "[w]hat's the geographic area that Beroth . . . controls the pricing for Amoco petroleum products to various dealers," Vernice responded "[w]ell, it—it could be Forsyth County or it could be like a Walkerton or a Kernersville or something like that." "Generally it's Forsyth County. But I—like I say, it could be—one side of town could be one price and the other side another." Plaintiff's counsel specifically asked Vernice Beroth "[a]s of December 1st, 1995, what was Beroth's pricing area as outlined in [Beroth's DSA]." He responded "I don't know. I don't know. I couldn't tell you. I just don't recall that." As some evidence of Beroth's pricing area, defendants admitted that "from 1994 to May 1999, Beroth . . . was the only Amoco distributor from whom the plaintiff could purchase Amoco petroleum products" in plaintiff's request for admissions.

Also it is unclear from the record how Beroth determined the price it charged for motor fuel sold to plaintiff. When asked, Walter Beroth stated that "In that—in those—in that—instances of those locations, we—we based the price on our liability." Establishing plaintiff's price for motor fuel based on Beroth's "liability" is different than "Beroth's dealer buying price . . . in effect in Beroth's pricing area," as required by the Beroth DSA. In any event, the record is inconclusive as to how Beroth determined the price it charged plaintiff.

Beroth, as a jobber, also sold motor fuel to five or six other independent Amoco dealers. We are unable to determine the number of other independent dealers to whom Beroth sold motor fuel from 1 December 1995 to 27 May 1999, the price Beroth charged those other dealers for motor fuels, and if those dealers were located in the same "Beroth's pricing area" as plaintiff.

On the record before us, we cannot ascertain whether Beroth sold motor fuels to plaintiff from 1 December 1995 until 27 May 1999

NEUGENT v. BEROTH OIL CO.

[149 N.C. App. 38 (2002)]

for "Beroth's dealer buying price . . . in effect in Beroth's pricing area." We hold that: (1) the size and location of "Beroth's pricing area" from 1 December 1995 until 27 May 1999; (2) the number of other independent dealers inside "Beroth's pricing area" that Beroth sold to, as an Amoco jobber, (3) the price that Beroth charged independent dealers and 4 Brothers stations for motor fuel, and (4) whether any 4 Brothers stations were located in "Beroth's pricing area" from 1 December 1995 until 27 May 1999, are all genuine issues of material fact which precludes summary judgment on plaintiff's breach of contract claim for the period between 1 December 1995 through 27 May 1999.

Each billing on or after 1 December 1995 could constitute a new and separate breach if Beroth sold motor fuel to plaintiff at a price other than "Beroth's dealer buying price . . . in effect in Beroth's pricing area." *See e.g.* 23 Samuel Williston, *A Treatise on the Law of Contracts* § 63.1 (Richard A. Lord ed., 4th ed. 2002) ("As a contract consists of a binding promise or set of promises, a breach of contract is a failure, without legal excuse, to perform any promise that forms the whole or part of a contract"); *see also* N.C. Gen. Stat. § 25-2-612 (1965).

Although genuine issues of material fact exist with respect to plaintiff's breach of contract claim of the Beroth DSA for the sale of motor fuel, plaintiff and counterclaim-defendant presented no evidence, and have not argued here, that they are not liable for rent payments for March, April, and May 1999 as alleged in Beroth's counterclaim. We affirm the trial court's grant of summary judgment for Beroth's counterclaim for past due rent for those months.

We also affirm plaintiff and counterclaim-defendant's liability for payment of motor fuel that Beroth sold to plaintiff from 10 through 17 May 1999. We remand for determination of the amount owed, using the price formula set forth in the Beroth DSA in accordance with this opinion.

The award of attorney fees, costs and interest to Beroth on its counterclaim is also remanded for a determination of the proper allocation of these fees, costs, and interest between Beroth's rental claims and motor fuel claims.

IV.  Civil Conspiracy

[5] Plaintiff contends that North Carolina law "permits one defrauded to recover from anyone who facilitated the fraud by agree-

**NEUGENT v. BEROTH OIL CO.**

[149 N.C. App. 38 (2002)]

ing for it to be accomplished," and that it was error for the trial court to grant summary judgment to defendants. We agree.

This State recognizes a cause of action for the facilitation of fraud. "While there is no recognized action for civil conspiracy in North Carolina, *Fox v. Wilson*, 85 N.C. App. 292, 354 S.E.2d 737 (1987), and this claim is couched in the language of conspiracy, our law nevertheless permits one defrauded to recover from anyone who facilitated the fraud by agreeing for it to be accomplished." *Nye v. Oates*, 96 N.C. App. 343, 346-47, 385 S.E.2d 529, 531 (1989). "When a cause of action lies for injury resulting from a conspiracy, 'all of the conspirators are liable, jointly and severally, for the act of any one of them done in furtherance of the agreement.' " *State ex rel. Long v. Petree Stockton, L.L.P,* 129 N.C. App. 432, 447, 499 S.E.2d 790, 799 (1998) (quoting *Fox*, 85 N.C. App. at 301, 354 S.E.2d at 743).

The elements of facilitating fraud are: (1) that the defendants agreed to defraud plaintiff; (2) that defendants committed an overt tortious act in furtherance of the agreement; and (3) that plaintiff suffered damages from that act. *Oates*, 96 N.C. App. at 347, 385 S.E.2d at 531-32 (citing *Coleman v. Shirlen*, 53 N.C. App. 573, 281 S.E.2d 431 (1981)).

Through the testimony of Walter Beroth, plaintiff presented evidence that on several occasions 4 Brothers stations located near plaintiff's station sold motor fuel to the public at a price per gallon less than Beroth sold motor fuel to plaintiff. Walter Beroth and Vernice Beroth also testified that Beroth now owned several of the other formerly independent dealer's stations that Beroth had previously sold motor fuel to as a jobber. These stations now operate as 4 Brothers stations.

Although not dispositive as to plaintiff's civil conspiracy claim, when viewed in the light most favorable to the plaintiff and according him every reasonable inference, defendants are not entitled to judgment as a matter of law. The trial court erred granting summary judgment for defendants on plaintiff's conspiracy claim.

## IV. Defendants' Affirmative Defenses

Defendants have affirmatively pled 17 defenses that they claim support the trial court's grant of summary judgment, although not all are argued. We do not address those not argued. N.C. R. App. P. 28(b)(5) (1999).

## A. Statute of Limitations

[6] The Statute of Limitations defense affirmatively pled to plaintiff's breach of contract claim is not a complete bar to plaintiff's recovery. The applicable statute of limitations for plaintiff's contract claim is four years from the date of any potential breach which may or may not have occurred on and after 1 December 1995 until 27 May 1999. *See* N.C. Gen. Stat. § 25-2-725(2) (1967) (a cause of action accrues when the breach occurs, even if the aggrieved party is unaware of the breach); N.C. Gen. Stat. § 25-2-725(1) (1967) (four year statute of limitation for breach of contract for the sale of goods). We conclude defendants' Statute of Limitations defense does not preclude plaintiff's contract claims that accrued on or after 1 December 1995. Plaintiff filed his complaint on 25 June 1999, well within the required four year period.

Plaintiff's fraud and conspiracy claims are governed by a three year statute of limitations. N.C. Gen. Stat. § 1-52(9) (1997). The statute commences from discovery of the fraud or from when it should have been discovered exercising ordinary care. *Sinclair v. Teal*, 156 N.C. 458, 72 S.E. 487 (1911). Plaintiff's unfair and deceptive trade practices claim is governed by a four year statute of limitation. N.C. Gen. Stat. § 75-16.2 (1979). The statute commences when the violations occur. *Hinson v. United Fin. Servs., Inc.*, 123 N.C. App. 469, 475, 473 S.E.2d 382, 387 (1996) (citing *United States v. Ward*, 618 F. Supp 884, 902 (E.D.N.C. 1985)).

Defendants argue that plaintiff "had Beroth's pricing to him as of January 18, 1995, and knew or should have known the facts constituting the alleged fraud . . . and unfair trade actions . . . as of January 1995 . . . . He had the ability to verify Beroth's pricing . . . ." We disagree.

Plaintiff could have verified the price "formula" at that time. Plaintiff had no way to determine whether defendants engaged in unfair and deceptive trade practices from 25 June 1995 until 30 November 1995. Also plaintiff had no way of knowing whether defendants' actions constituted fraud, unfair and deceptive trade practice, and/or conspiracy on and after 1 December 1995. Given the limited record before us, genuine issues of fact preclude us from determining the dates that the three and four year statute of limitations respectively began to run on these claims.

NEUGENT v. BEROTH OIL CO.

[149 N.C. App. 38 (2002)]

## B.  Corporate Veil

**[7]** Defendants affirmatively pled corporate veil and argue here that the trial court properly dismissed plaintiff's claims against 4 Brothers, and Walter and Vernice Beroth. Defendants contend that plaintiff offered no evidence that Walter and Vernice Beroth were acting in their individual capacities, and that plaintiff offered no evidence that 4 Brothers were liable under any of his claims. Again we disagree.

The judgment does not contain findings of fact or conclusions of law regarding whether 4 Brothers, or Walter and Vernice Beroth are proper defendants. Reviewing the evidence in the light most favorable to plaintiff, we conclude that genuine issues of fact exist as to whether 4 Brothers, Walter Beroth and/or Vernice Beroth defrauded, unfairly and deceptively practiced trade, and conspired against plaintiff. The trial court erred granting summary judgment for defendants on these claims.

## C.  Ratification, Waiver, Estoppel

**[8]** Defendants next contend that plaintiff "ratified the Beroth's contract and pricing" arguing that plaintiff did not bring suit until 3 years after he learned of the freight charge and only when plaintiff was in default. Defendants conclude that plaintiff "cannot assert claims for unfair trade practices, breach of contract, fraud, or civil conspiracy against any of defendants."

It is true that "[a] cause of action premised on fraud or misrepresentation may be waived by affirmative acts taken by a plaintiff that amount to a ratification of the transaction." David A. Logan and Wayne A. Logan, *North Carolina Torts* § 25.10, at 545 (1996) (citing *Hawkins v. Carter*, 196 N.C. 538, 146 S.E.2d 231 (1929)); *see also Link v. Link*, 278 N.C. 181, 197, 179 S.E.2d 697, 706 (1971) (citations omitted). "It is equally clear, however, that an act of the victim of any of these wrongs will not constitute a ratification of the transaction thereby induced unless, at the time of such act, the victim had full knowledge of the facts and was then capable of acting freely." *Link*, 278 N.C. at 197, 179 S.E.2d at 706-07 (citations omitted).

Plaintiff admitted that he became aware of the "freight charge" on 4 July 1996. That fact alone is inconclusive evidence that plaintiff was aware that defendants may have sold motor fuel to plaintiff at a price other than "Beroth's dealer buying price. . . in effect in Beroth's pricing area." Beroth, as seller, set the "dealer buying price" and the "pricing area." Viewing the evidence in the light most favorable to

plaintiff, plaintiff did not have full knowledge of all material facts concerning "Beroth's dealer buying price" and "Beroth's pricing area" sufficient for the trial court to conclude, as a matter of law, that plaintiff acted freely and ratified defendants wrongdoing, if any.

## V. Plaintiff's Affirmative Defenses

Plaintiff contends that his affirmative defenses of duress, failure of consideration, fraud, illegality, and payment should have prevented the trial court from granting Beroth summary judgment on its counterclaim.

We affirmed the trial court granting Beroth summary judgment on its counterclaim on the issues of past due rent and plaintiff and counterclaim-defendant's liability for payment of motor fuel purchased but unpaid only. The amount plaintiff owes Beroth must await the determination of whether a breach of contract occurred and application of the proper price. Plaintiff and counterclaim-defendant failed to argue these affirmative defenses to that portion of the judgment. These affirmative defenses do not bar Beroth's recovery.

## VII. Conclusion

After a thorough review of the limited record and arguments of the parties, we conclude that genuine issues of material fact preclude summary judgment for defendants on plaintiff's claims, except for plaintiff's contract claims prior to 1 December 1995. We also conclude that Beroth is entitled to partial summary judgment on its counterclaim.

We affirm that portion of the trial court's grant of summary judgment (A) for defendants on plaintiff's (1) breach of an alleged oral contract, and (2) breach of contract claim during the period from 18 January 1995 until 30 November 1995, the period during which the parties operated under the Amoco lease and Amoco DSA; (B) for Beroth's counterclaim for past due rent and for plaintiff and counterclaim-defendant's liability for payment of motor fuel purchased from 10 May to 17 May 1999. The amount owed for motor fuel should be determined by application of the appropriate contract price after a determination of whether or not defendants breached the Beroth DSA.

We affirm the trial court's award, but not amount, of attorney fees, costs, and interest to Beroth on its counterclaim for past due rent and plaintiff and counterclaim-defendant's liability for motor fuel

payments. We remand for the trial court's proper determination and allocation of those fees, costs, and interest.

We reverse and remand for trial on plaintiff's claims for (1) breach of contract between 1 December 1995 through 27 May 1999, and the amount that plaintiff and counterclaim-defendant owe Beroth for unpaid motor fuel purchases, (2) civil conspiracy, (2) fraud, (3) unfair and deceptive trade practices, and (4) punitive damages.

Affirmed in part, reversed and remanded in part.

Judges TIMMONS-GOODSON and HUDSON concur.