UNPUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 06-1608

CHICAGO TITLE INSURANCE COMPANY,

Plaintiff - Appellant,

versus

JOHN FISHER,

Defendant - Appellee.

Appeal from the United States District Court for the Eastern District of North Carolina, at Greenville.  Malcolm J. Howard, Senior District Judge.  (5:04-cv-00815-H)

Argued:  May 24, 2007                    Decided:  August 21, 2007

Before MICHAEL, Circuit Judge, WILKINS, Senior Circuit Judge, and David C. NORTON, United States District Judge for the District of South Carolina, sitting by designation.

Affirmed by unpublished per curiam opinion.

Paul K. Sun, Jr., ELLIS & WINTERS, L.L.P., Raleigh, North Carolina, for Appellant.  John N. Hutson, Jr., HOWARD, STALLINGS, FROM & HUTSON, P.A., Raleigh, North Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Appellant Chicago Title Insurance Company ("Chicago Title") appeals from the district court's award of summary judgment to Appellee John Fisher ("Fisher"). See Chicago Title Insurance Company v. John Fisher, No. 5:04-cv-815-H(2) (E.D.N.C. April 19, 2006) (the "Order"). As explained below, we affirm.

I.

A.

John Fisher was one of three member/managers of the Koury Fisher Group, LLC, which was formed in 1996 to build residential homes. Fisher served as the business manager for the LLC, Mike Koury was a licenced real estate agent responsible for purchasing and selling the lots, and Jeb Koury was a licensed general contractor who focused on the construction of the homes. In managing the LLC's day-to-day activities, Fisher was directly and personally involved in all financial transactions for the Koury Fisher Group. Fisher secured the financing for the building projects, worked directly with the LLC's accountants, and oversaw payment of subcontractors on the Koury Fisher Group's various jobs, including the lot and home at issue in this case. The LLC's checks were signed by the bookkeeper, using a rubber stamped facsimile of Fisher's signature.

2

In November 2000, the Koury Fisher Group bought Lot 52 in the Chatsworth Subdivision. In early 2001, the Koury Fisher Group began construction of a house on Lot 52. The Koury Fisher Group hired subcontractors for Lot 52 and was responsible for paying their invoices. In August 2001, the Koury Fisher Group obtained additional financing from Wachovia in the amount of $52,500, which was secured, in part, by a second deed of trust on Lot 52. Fisher executed this deed of trust as business manager of the Koury Fisher Group, and also personally guaranteed the debt. The agreement with Wachovia required the Koury Fisher Group to pay off this loan from the proceeds of the first sale of a home.

In November 2001, the Koury Fisher Group agreed to sell Lot 52 and the home built thereon to Blaine Gerber and Elizabeth King (the "Buyers"). Chicago Title issued title insurance in connection with the sale of Lot 52. Execution of a lien waiver by the seller, the Koury Fisher Group, was a prerequisite to issuance of the title insurance policy. A lien waiver is an affidavit signed by the seller of residential property that, inter alia, either states that all contractors and subcontractors on the property have been fully paid, or lists the contractors and subcontractors that have not been fully paid.

Mike Koury, on behalf of the Koury Fisher Group, signed the lien waiver in connection with, and in order to close, the sale of Lot 52. The lien waiver identified the Koury Fisher Group as

3

"Owner and General Contractor." The lien waiver stated that all contractors and subcontractors on Lot 52 had been paid in full. When Koury signed the lien waiver at the closing, he knew that all of the contractors and subcontractors had not been fully paid. The Koury Fisher Group planned to use the proceeds from subsequent sales of the LLC's properties to pay the unpaid subcontractors on Lot 52. Fisher was not present when Koury signed the lien waiver nor did Fisher make any representations regarding the lien waiver to Chicago Title.

On October 31, 2001, the Koury Fisher Group sold the improved Lot 52 to Buyers for $824,080. Mike Koury was present at the closing; Fisher was not. Following receipt of the closing documents, Chicago Title, through its local agent, issued a title insurance policy to Buyers. At the time, Chicago Title was unaware that there were unpaid subcontractors who had performed work on Lot 52. Relying on the lien waiver, Chicago Title issued a title insurance policy with no exception for unfiled liens.

The Koury Fisher Group's plan to use the proceeds from the sale of other properties to pay off the subcontractors quickly collapsed. According to Fisher, "We were unable to sell our remaining inventory (Lots 2, 17, 26, Richmond Hill) as hoped and planned." J.A. 183. Fisher faced an additional problem after the Lot 52 closing because he had personally guaranteed the August 2001 loan from Wachovia. The Koury Fisher Group's agreement with

4

Wachovia required paying off the August 2001 loan immediately upon the sale of any of the Koury Fisher Group's properties, and Lot 52 was the first sale following this loan. The proceeds of the sale of Lot 52, however, were not sufficient to repay the August 2001 loan. Because all of the Koury Fisher Group's remaining properties (Richmond Hill Lots 2, 17, and 26) were already encumbered to Wachovia, Fisher explored other options to ensure the cancellation of the August 2001 deed of trust. Ultimately, Fisher paid back $25,000 of his loan from the Koury Fisher Group, which used these funds along with an additional payment by Fisher to pay off the Wachovia loan and release the Koury Fisher Group properties from the encumbrance of the August 2001 deed of trust.

The Koury Fisher Group is now dissolved, leaving various unpaid debts.

Subsequent to Chicago Title's issuance of the title insurance policy and the closing of the sale of Lot 52, numerous unpaid subcontractors filed liens against the property. Some of these unpaid subcontractors also filed lawsuits against the Buyers, and asserted claims against Lot 52. Consistent with its policy obligations, Chicago Title defended the Buyers against the lien claimants. Chicago Title has paid in excess of $200,000 to defend the Buyers and obtain cancellation of the subcontractors' liens.

Chicago Title initially pursued claims of fraud and unfair and deceptive trade practices against Mike Koury. On January 13, 2005,

5

the United States Bankruptcy Court for the Eastern District of North Carolina entered a Consent Judgment against Koury, holding that Chicago Title "is entitled to the relief requested in the Complaint filed in this action."  J.A. 177.

B.

On November 12, 2004, Chicago Title filed a Complaint against John Fisher, asserting claims of (1) fraud and (2) unfair and deceptive trade practices.  On November 5, 2005, Fisher moved for summary judgment, arguing that he could not be held liable for Mike Koury's execution of the fraudulent lien waiver.  Chicago Title responded that Fisher conspired with Mike Koury and agreed that Koury would sign the false lien waiver.  In the alternative, Chicago Title asserted that Fisher participated in and/or ratified Koury's wrongful conduct.

On April 19, 2006, Judge Malcolm Howard of the United States District Court for the Eastern District of North Carolina at Greenville granted Fisher's motion for summary judgment and dismissed Chicago Title's claims. In its Order, the district court found there was insufficient evidence of conspiracy between Fisher and Koury or of Fisher's participation in or ratification of Koury's conduct to sustain liability against Fisher as an individual.  Accordingly, the district court granted Fisher's

6

motion and dismissed Chicago Title's causes of action for fraud and for unfair and deceptive trade practices.

## II.

We review a district court's grant of summary judgment de novo, applying the same standard as the district court. <u>Hinckle v. City of Clarksburg</u>, 81 F.3d 416, 421 (4th Cir. 1996). Summary judgment is permissible when "there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c). We are not to weigh the evidence but rather to determine if there is a genuine issue for trial. <u>See Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986). All evidence should be viewed in the light most favorable to the non-moving party. <u>See Perini Corp. v. Perini Constr., Inc.</u>, 915 F.2d 121, 123-24 (4th Cir. 1990). "[W]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, disposition by summary judgment is appropriate." <u>Teamsters Joint Council No. 83 v. Centra, Inc.</u>, 947 F.2d 115, 119 (4th Cir. 1991).

"[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). The

"obligation of the nonmoving party is 'particularly strong when the nonmoving party bears the burden of proof.'" Hughes v. Bedsole, 48 F.3d 1376, 1381 (4th Cir. 1995) (quoting Pachaly v. City of Lynchburg, 897 F.2d 723, 725 (4th Cir. 1990)).

### III.

Chicago Title contends on appeal that the district court erred in concluding it had produced insufficient evidence to create a genuine issue of material fact that Fisher conspired with Michael Koury to defraud Chicago Title and/or participated in and ratified Koury's wrongful act. Having thoroughly reviewed the record, the Order, and the parties' appellate briefs, and having heard and considered oral arguments, we are satisfied that the court did not so err.

We begin by noting that Chicago Title's argument that Fisher ratified and thereby became liable for Koury's wrongful conduct is without merit. Ratification is "'the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him.'" Walker v. Sloan, 529 S.E.2d 236, 244 (N.C. Ct. App. 2000) (quoting In re Espinosa v. Martin, 520 S.E.2d 108, 111 (N.C. Ct. App. 1999)); see Edwards v. Southern States Finance Co., 146 S.E. 89 (N.C. 1929) ("Ordinarily, a director of a corporation is liable for false and

8

fraudulent representations made by him or his agent, within the scope of his employment, or for such as were approved or ratified."). Central to the concept of ratification is that the unauthorized conduct was performed by the agent of - or one purporting to be the agent of - the person who later ratified the conduct. In this case, Koury, the person who made the fraudulent representations, was not the agent of Fisher; rather, Koury was the agent of the Koury Fisher Group. Fisher cannot "ratify" and thereby become liable for the fraudulent conduct of one who is not his agent. Tate v. Chambers, 379 S.E.2d 681, 683 (N.C. Ct. App. 1989) (holding that "there is no question of ratification since 'ratification is not possible unless the person making the contract, in doing so, purported to act as the agent of the person ... claimed to be the principal'"). There is no authority for Chicago Title's contention that an officer of a corporation may "ratify" and be personally liable for the torts of a fellow officer. As such, absent evidence that Fisher participated in or facilitated the fraudulent act, Fisher is not liable for the acts of his fellow corporate officers.

Under North Carolina law, the essential elements of fraud are: (1) a false representation or concealment of some material past or existing fact; (2) that is reasonably calculated to deceive; (3) that is made with the intent to deceive and (4) which does in fact deceive and results in damage to the injured party. See Fakhoury

9

v. Fakhoury, 613 S.E.2d 729, 733 (N.C. Ct. App. 2005). The law of North Carolina also "permits one defrauded to recover from anyone who facilitated the fraud by agreeing for it to be accomplished." Neugent v. Beroth Oil Co., 560 S.E.2d 829, 838-39 (N.C. Ct. App. 2002) (citing Nye v. Oates, 385 S.E.2d 529, 531 (N.C. Ct. App. 1989); see Dove v. Harvey, 608 S.E.2d 798, 800 (N.C. Ct. App. 2005), disc. rev. denied, 628 S.E.2d 249 (N.C. 2006); Esposito v. Talbert & Bright, Inc., 641 S.E.2d 695, 698 (N.C. Ct. App. 2007). The elements of facilitating fraud are: (1) that the defendant agreed with another person to defraud plaintiff; (2) that either defendant or the other person committed an overt tortious act in furtherance of the agreement; and (3) that plaintiff suffered damages from that act. See Oates, 385 S.E.2d at 531-32 (citing Coleman v. Shirlen, 281 S.E.2d 431 (N.C. Ct. App. 1981)). Although facilitation of fraud may be established by circumstantial evidence, the evidence of the agreement must be more than a suspicion or conjecture to justify submission of the issue to the jury. Dickens v. Puryear, 276 S.E.2d 325, 337 (N.C. 1981); Di Frega v. Pugliese, 596 S.E.2d 456, 461-62 (N.C. Ct. App. 2004). Accordingly, to survive summary judgment on its claims, Chicago Title must point to some evidence that Fisher either directly made an affirmative misrepresentation to Chicago Title or agreed with Koury to defraud Chicago Title.

There is no evidence that Fisher participated directly in the fraud; he did not sign the fraudulent lien waiver, see the lien waiver prior to its execution, or make any representations to Chicago Title whatsoever.  The best evidence Chicago Title presents in support of its claim that Fisher facilitated the fraud is the deposition testimony of Mike Koury.[*]  When viewed in the light most

---

[*]In his deposition, Koury testified as follows:

Q:  Prior to signing the lien waiver agreement, did you have any discussions with anyone about it?
A:  I probably talked to Jeb and John about it.
Q:  When you say "probably," can you remember those conversations?
A:  No, not exactly.
Q:  When you say "probably," do you know what those conversations would have consisted of?
A:  If I can sign it and if I should sign it.
Q:  When you say if you "could sign it," what did you mean?
A:  Because we did owe outstanding bills.
Q:  Did you ever have a conversation like that with Jeb or John?
A:  I think that's what we talked about and probably just with John.

J.A. 49 - 50.

Q:  What did he tell you?
A:  I don't remember, other than, probably, it was conveyed that we had other people interested in other houses, and we thought they were going to sell, and we'd be able to pay these bills.
Q:  Did you have any hesitancy about signing the lien waiver?
A:  Yes.
Q:  Why was that?
A:  Because of the reason I talked to John.
Q:  So were you aware when you signed this that there were subcontractors or contractors that had not been paid?
A:  I knew there were bills outstanding, yes.
Q:  And is that what caused you to have some hesitancy about signing the lien waiver?
A:  Yes.
Q:  And did you raise that issue with John Fisher?
A:  I think that's what we talked about, yes.

11

favorable to Chicago Title and according it every reasonable inference, this testimony only proves that, prior to the closing of Lot 52, Koury and Fisher "probably" discussed the lien waiver and

---

J.A. 51.

Q: Based on your conversation with John Fisher, did you feel comfortable signing the lien waiver?
A: I guess I did.

J.A. 52.

Q: Sure. What I'm wondering is, you stated you had some hesitancy about signing the lien waiver based on the unpaid contractors; is that correct?
A: Yes.
Q: And you also stated that there were some houses that y'all were developing that might be sold in the near future at that time?
A: Uh-huh (yes).
Q: So, what I'm wondering is why, then, did you talk with John prior to signing this lien waiver?
A: Because I knew of the same, because I knew houses might sell. So why did I go to him?
Q: Uh-huh (yes).
A: I knew the houses, because I was working on them. And I saw customers looking at them, and I would get feedback from - Actually, my ex-wife, the decorator, was over there quite a bit working at Richmond Hill. And she was talking to some people who had looked at the house six or seven times, one of them. So, I communicated that to John, and that's probably when we talked about the lien waiver.
Q: Why did you talk to John prior to signing the lien waiver, based on what you knew at the time?
A: He was pretty much our business manager.
Q: Would you have been able to sign the lien waiver without talking to John?
A: Do you mean for the company?
Q: Uh-huh (yes).
A: I think I was entitled to.
Q: Did you ever sign lien waivers without talking to John?
A: I don't remember.

J.A. 53-54.

12

the fact that not all the subcontractors had been paid.  Koury's recollection of this conversation - if it did occur - is vague; however, Koury does not suggest that Fisher agreed with or knew about Koury's plan to issue a falsified document.  As such, Chicago Title has presented no evidence that Fisher participated in or agreed to Koury's fraudulent conduct.  A fact finder's conclusion that Fisher encouraged or agreed with Koury's act of fraud would be mere suspicion or conjecture.  See Dickens, 276 S.E.2d at 337 (holding that allegations of conspiracy in complaint and possible speculation as to an agreement based on defendant's presence at the site where plaintiff was beaten and threatened, is not enough to survive summary judgment).  For this reason, we agree with the district court's finding that Fisher is entitled to summary judgment.

IV.

In considering whether summary judgment was properly granted, the critical question is whether "a fair-minded jury could return a verdict for the plaintiff on the evidence presented."  Anderson, 477 U.S. at 252.  Because Chicago Title has failed to present evidence from which one could conclude that Fisher ratified, participated in, or agreed with Koury's wrongful conduct, we cannot

answer this question in the affirmative.  The decision below is therefore affirmed.

<u>AFFIRMED</u>
