Potts v. KEL, LLC, 2019 NCBC 29.

STATE OF NORTH CAROLINA

IREDELL COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
16 CVS 2877

W. AVALON POTTS, individually
and derivatively on behalf of Steel
Tube, Inc.,

     Plaintiff,

v.

KEL, LLC; RIVES & ASSOCIATES,
LLP,

     Defendants,

   and

STEEL TUBE, INC.,

     Nominal Defendant,

   and

LEON L. RIVES, II,

     Defendant/
     Counterclaimant/
     Third-Party Plaintiff,

 v.

AVALON1, LLC,

     Third-Party Defendant/
     Counterclaimant.

**ORDER AND OPINION ON
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

1.     This case arises out of a dispute over the management of Steel Tube, Inc., a North Carolina-based manufacturer founded nearly 30 years ago by Walter Lazenby and Plaintiff W. Avalon Potts. The two served as Steel Tube's only officers and directors until 2015, when Lazenby sold all of his stock to Defendant Leon L. Rives, II and resigned from the company. Rives was no stranger to Steel Tube—he and his accounting firm, Rives & Associates, LLP, had long provided tax advice and tax

preparation services to the company. But his arrival reshaped Steel Tube's management, with Rives becoming an officer and stepping into Lazenby's place as one of the two directors, along with Potts.

2. The relationship between Potts and Rives seems to have been rocky from the start. In this action, Potts alleges that Rives began abusing his position as officer and director almost immediately, siphoning funds for personal use and transferring money and equipment to companies owned by his family. Potts asserts a host of claims, both individual and derivative, against Rives for breach of fiduciary duty, constructive fraud, conversion, unjust enrichment, and fraud, among others. Potts also brings claims against Rives & Associates (for providing shoddy tax services) and KEL, LLC (for facilitating Rives's alleged fraud).

3. Rives and Rives & Associates have moved for summary judgment as to the claims asserted against them under Rule 56 of the North Carolina Rules of Civil Procedure. For the reasons stated below, the motion is **GRANTED** in part and **DENIED** in part.

*Moore and Van Allen, PLLC, by Mark A. Nebrig and John T. Floyd, for Plaintiff W. Avalon Potts.*

*Sharpless McClearn Lester Duffy, PA, by Frederick K. Sharpless and Pamela S. Duffy, for Defendants Leon L. Rives, II and Rives & Associates, LLP.*

*No counsel appeared for Defendant KEL, LLC.*

Conrad, Judge.

## I.
## BACKGROUND

4.      The Court does not make findings of fact in ruling on motions for summary judgment.  The following background, drawn from the evidence submitted in support of and opposition to the motion, is intended only to provide context for the Court's analysis and ruling.

5.      Steel Tube is a "carbon steel and galvanized steel tube manufacturer."  (V. Am. Compl. ¶ 13, ECF No. 17 ["Compl."].)  At the time of Steel Tube's founding, Potts and Lazenby divided its stock equally between them.[1]  Potts has been an owner, officer, and director ever since.  (Aff. W. Avalon Potts ¶¶ 2, 3, ECF No. 119.3 ["Potts Aff."].)

6.      Rives is a Certified Public Accountant.  (Aff. Leon L. Rives, II ¶ 2, ECF No. 111.1 ["Rives Aff."].)  He became familiar with Steel Tube in his role as tax preparer and adviser.  (Rives Aff. ¶ 2.)  In July 2014, Rives offered to buy all of Steel Tube's stock from Potts and Lazenby for more than $2 million—a deal that would have made Rives the company's sole owner.  (Rives Aff. ¶ 3; *see also* Potts Aff. ¶ 6.)  By year's end, though, negotiations had reached an impasse, and Potts declined the offer.  (Compl. ¶ 17; *see also* Potts Aff. ¶ 6.)  Rives settled instead for an agreement to buy Lazenby's shares for $600,000, split between an initial lump sum of $20,000 and monthly installments of $6,000 for the remainder.  (Lazenby Aff. ¶¶ 2, 4, 5; Defs.' Br.

---

[1] It appears that Lazenby later transferred half of his shares to his wife. (*See* Aff. Walter L. Lazenby, Jr. ¶ 2, ECF No. 119.15 ["Lazenby Aff."].)  That transfer isn't material to the disputed issues, so for simplicity, the Court refers to the stock owned by Lazenby and his wife as Lazenby's stock.

in Supp. Mot. Summ. J. Ex. 9, ECF No. 111.9 ["Purchase Agrmt."].) Lazenby retained a security interest in the shares. (Purchase Agrmt. 2.)

7. The sale of Lazenby's shares was finalized on January 15, 2015. (*See* Lazenby Aff. ¶¶ 5, 9.) That same day, Lazenby and Rives executed an Acceptor Management Agreement. (*See* Defs.' Br. in Supp. Mot. Summ. J. Ex. 10, ECF No. 111.10 ["Management Agrmt.]".) The Acceptor Management Agreement purports to engage Rives and one of Rives's closely held entities, together referred to as "MANAGESTEEL," for the purpose of managing Steel Tube's operations. (*See* Management Agrmt.) Neither Lazenby nor Rives informed Potts of the Acceptor Management Agreement or its terms. (*See* Lazenby Aff. ¶ 10; Potts Aff. ¶ 9; Dep. L. Rives 110:9–15, ECF No. 111.3.) Lazenby then resigned as an officer and director of Steel Tube a few days later. (Lazenby Aff. ¶ 9.)

8. In February 2015, Potts and Rives held their first shareholder meeting as co-owners of Steel Tube. (*See* Dep. A. Potts 42:10–43:3, ECF No. 111.2; *see also* Pl.'s Opp'n Defs.' Mot. Summ. J. Ex. A1, ECF No. 119.2.) The two elected themselves as directors, convened a meeting as board of directors, and then elected Potts as president and Rives as secretary and treasurer. (Compl. Ex. 5; Defs.' Br. in Supp. Mot. Summ. J. Ex. 16, ECF No. 111.16.) Potts asserts, and Rives disputes, that they orally agreed not to make material transactions of more than $25,000 without the other's consent. (*See* Potts Aff. ¶ 10; Rives Aff. ¶ 6.)

9. Over the next 18 months, Rives authorized a series of transactions that Potts characterizes as self-dealing or otherwise not in Steel Tube's best interests. It

is undisputed, for example, that Rives caused Steel Tube to issue a $20,000 check to Lazenby, began making monthly cash withdrawals of $7,500, and deposited another $62,875 into his personal bank account. (*See* Dep. L. Rives 114:24–115:7, 156:1–7, 189:3–9.) Potts offers evidence that Rives took the funds without authorization and for his own personal benefit, including to pay for his purchase of Lazenby's shares. (*See* Potts. Aff. ¶ 15(a)–(g); *see* Dep. A. Potts 62:7–63:11, 68:7–14, 70:21–71:4.) Rives responds that the payment to Lazenby was compensation for services to Steel Tube, that the monthly withdrawals were an approved salary, and that Potts agreed to the $62,875 distribution for tax purposes. (*See* Rives Aff. ¶ 4; Dep. L. Rives 98:10–12, 157:16–22, 193:6–8.)

10. Other disputed transactions involve companies in which Rives or members of Rives's family hold an interest. One is Elite Tube & Fab, LLC ("Elite Tube"), a company that Rives helped form and in which his wife was a member. (*See* Dep. L. Rives. 247:7–248:4; Rives Aff. ¶ 7.) The second is KEL, a company formed and owned by Rives's brothers. (*See* Dep. L. Rives 287:22–23.) It is undisputed that Rives transferred cash and equipment to Elite Tube and made a deal with KEL to handle certain transportation and trucking services for Steel Tube. (*See* Rives Aff. ¶¶ 7, 10.)

11. Rives maintains that all of these actions were proper. The transfers to Elite Tube, he asserts, were part of a planned joint venture designed to expand Steel Tube's business and reach new customers, and the deal with KEL lowered shipping costs and made transportation more convenient. (*See* Rives Aff. ¶ 7; Dep. L. Rives 40:5–7, 255:16–25, 290:21–291:18.) Potts, on the other hand, believes the transfers to Elite

Tube were little more than theft and that the contract with KEL diverted a corporate opportunity from Steel Tube. (*See, e.g.*, Dep. A. Potts 62:7–63:11, 68:7–14, 70:21–71:4; Potts Aff. ¶ 15(a)–(g).)

12. Potts also alleges that Rives misrepresented other actions. Shortly after joining Steel Tube, Rives proposed converting it into an S corporation for tax purposes. (*See* Potts Aff. ¶ 13; Rives Aff. ¶ 5.) As alleged, Rives or Rives & Associates prepared the paperwork and made the conversion effective October 1, 2014—a date several months before Lazenby sold his shares to Rives. (*See* Potts Aff. ¶ 13; *see also* Rives Aff. ¶ 5; Lazenby Aff. ¶¶ 5–7.) Potts signed off on the conversion but testifies that he was not told about the effective date, which he now believes was improper and caused Steel Tube to incur costs and penalties. (*See* Potts Aff. ¶ 13; Aff. Thomas M. Borden ¶¶ 4–8, ECF No. 119.20 ["Borden Aff."].)

13. Potts filed this action against Rives in November 2016. As originally filed, the complaint requested dissolution of Steel Tube based on alleged wrongdoing and waste of corporate assets by Rives. Potts also alleged the existence of an insoluble management deadlock because neither he nor Rives owned a majority of Steel Tube's stock.

14. On February 22, 2017, Potts amended his complaint and alleged that he was now the "sole shareholder" of Steel Tube. (Compl. ¶ 4.) As detailed in other Orders, Potts acquired Lazenby's security interest in Rives's stock and then repossessed it after Rives defaulted. (*See* Order on Mot. to Am. ¶¶ 24–30, ECF No. 57.) Potts also took steps to remove Rives as officer and director. (*See* Order on Mot. to Am. ¶ 7;

Defs.' Br. in Supp. Mot. Summ. J. 22, ECF No. 110 ["Br. in Supp."].) Having taken full control of Steel Tube, Potts abandoned his request for dissolution and asserted seventeen new claims for relief, including a mix of individual and derivative claims. Among other things, Potts claimed that Rives breached fiduciary duties owed to Steel Tube and to Potts, committed fraud, converted funds and property, and was unjustly enriched.

15. Potts also added Rives & Associates, Elite Tube, and KEL as defendants. KEL has made no appearance and is in default. (*See* Entry of Default, ECF No. 104.) Potts voluntarily dismissed all claims against Elite Tube, pursuant to a Court-approved settlement agreement. (*See* Order Approving Voluntary Dismissal, ECF No. 95.)

16. In December 2017, Rives and Rives & Associates moved to dismiss some claims in the amended complaint. (*See* Defs.' Mot. Dismiss, ECF No. 70.) The Court granted that motion in part and dismissed Potts's individual claim for fraud, the claim for unfair or deceptive trade practices, and the claim for negligent misrepresentation. *See Potts v. KEL, LLC*, 2018 NCBC LEXIS 24, at *18–19 (N.C. Super. Ct. Mar. 27, 2018). The Court denied the motion as to Potts's derivative claims for fraud and facilitating fraud and also allowed Potts's individual claims for constructive fraud and breach of fiduciary duty to proceed to the extent they seek recovery for individual injuries, rather than injuries to Steel Tube. *See id.* at 19.

17. Discovery has closed, and Rives and Rives & Associates have moved for summary judgment on all remaining claims against them. (Defs.' Mot. Summ. J.,

ECF No. 109.)  After full briefing, the Court held a hearing on November 28, 2018, at which counsel for Potts, Rives, and Rives & Associates appeared.  The motion is now ripe for determination.

## II.
## LEGAL STANDARD

18.    Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law."  N.C. R. Civ. P. 56(c).  In deciding a motion for summary judgment, the Court views the evidence "in the light most favorable to the nonmov[ant]," taking the nonmovant's evidence as true and drawing inferences in its favor.  *Furr v. K-Mart Corp.*, 142 N.C. App. 325, 327, 543 S.E.2d 166, 168 (2001) (internal citation and quotation marks omitted).

19.    The moving party "bears the initial burden of demonstrating the absence of a genuine issue of material fact."  *Liberty Mut. Ins. Co. v. Pennington*, 356 N.C. 571, 579, 573 S.E.2d 118, 124 (2002) (citation omitted).  If the moving party carries this burden, the responding party "may not rest upon the mere allegations or denials of his pleading," N.C. R. Civ. P. 56(e), but must instead "come forward with specific facts establishing the presence of a genuine factual dispute for trial," *Liberty Mut. Ins. Co.*, 356 N.C. at 579, 573 S.E.2d at 124.  "An issue is 'genuine' if it can be proven by substantial evidence and a fact is 'material' if it would constitute or irrevocably establish any material element of a claim or a defense."  *Lowe v. Bradford*, 305 N.C.

366, 369, 289 S.E.2d 363, 366 (1982) (citing *Bone Int'l, Inc. v. Brooks*, 304 N.C. 371, 374–75, 283 S.E.2d 518, 520 (1981)).

III.

ANALYSIS

20. All of Potts's claims arise out of Rives's two-year tenure as an officer and director of Steel Tube. The Court begins with the claims premised on Rives's fiduciary duties.

A. <u>Fiduciary Claims</u>

21. Claims for breach of fiduciary duty and constructive fraud are often paired together, as they are here. An essential element of each is the existence of a confidential or fiduciary relationship. To establish a breach of fiduciary duty, Potts must show the existence of a fiduciary duty, a breach of that duty, and injury proximately caused by the breach. *See Green v. Freeman*, 367 N.C. 136, 141, 749 S.E.2d 262, 268 (2013). Constructive fraud requires an additional element: Potts must show that Rives sought to benefit himself through the breach. *See White v. Consol. Planning, Inc.*, 166 N.C. App. 283, 294, 603 S.E.2d 147, 155–56 (2004).

22. Here, Potts asserts two sets of claims for breach of fiduciary duty and constructive fraud. There is one set of claims based on duties that Rives allegedly owed to Potts individually and a second set of derivative claims based on duties that Rives owed to Steel Tube. For each, Potts contends that Rives used Steel Tube as his "personal piggy bank," transferring funds and property to himself and his family. (*See* Pl.'s Opp'n Defs.' Mot. Summ. J. 1, ECF No. 118 ["Opp'n"].) Rives responds that

he did not owe any fiduciary duties to Potts and that he did not breach any duties owed to Steel Tube. (*See, e.g.*, Br. in Supp. 13–16.)

1. Individual Claims

23. The individual claims for breach of fiduciary duty and constructive fraud are based on duties allegedly owed to Potts by Rives "as *de facto* controlling shareholder." (Compl. ¶ 47.) Rives argues that he was not a controlling shareholder and therefore owed no fiduciary duties to Potts individually. (*See* Br. in Supp. 17–18.)

24. The general rule is that shareholders "do not owe a fiduciary duty to one another." *Brewster v. Powell Bail Bonding, Inc.*, 2018 NCBC LEXIS 76, at *9 (N.C. Super. Ct. July 26, 2018). One exception to this rule is that a majority shareholder owes a duty to protect the interests of minority shareholders. *See Corwin v. British Am. Tobacco PLC,* 371 N.C. 605, 616, 821 S.E.2d 729, 737 (2018) ("*Corwin II*"). This exception does not apply here because Rives was not a majority shareholder. He and Potts each owned 50 percent of Steel Tube's stock. (*See* Rives Aff. ¶ 3; Potts Aff. ¶¶ 2, 10.)

25. Potts relies on a second exception, adopted by the North Carolina Court of Appeals, "that a minority shareholder exercising actual control over a corporation may be deemed a 'controlling shareholder' with a concomitant fiduciary duty to the other shareholders." *Corwin v. British Am. Tobacco PLC*, 251 N.C. App. 45, 51, 796 S.E.2d 324, 330 (2016), *rev'd* 371 N.C. 605, 821 S.E.2d 729 (2018). That holding, which was based on cases from Delaware, was controlling law at the time of the hearing on the motion for summary judgment but under review by the North Carolina

Supreme Court. Shortly after the hearing, the Supreme Court issued a decision reversing the Court of Appeals and expressly reserving judgment as to whether a controlling minority shareholder owes a duty to other shareholders. *See Corwin II,* 371 N.C. at 616, 821 S.E.2d at 737. The Supreme Court concluded that it was unnecessary to decide whether North Carolina should adopt the Delaware rule because, even if that rule governed, the plaintiff in the case had not adequately alleged actual control. *See id.* at 616, 619, 821 S.E.2d at 737, 739.

26. So too here. Potts has not put forward evidence from which a jury could infer that Rives exercised actual control over Steel Tube. The "inquiry focuses on actual control over *the board of directors*," and the undisputed evidence shows that Rives did not possess or exercise control over Steel Tube's board, which consisted only of Rives and Potts. *Id.* at 616, 821 S.E.2d at 737 (citing Delaware law) (emphasis in original). All of the evidence shows that each man had equal power to propose and vote on initiatives. (Dep. L. Rives 128:14–17; Dep. A. Potts 42:10–14; *see also* Defs.' Br. in Supp. Mot. Summ. J. Ex. 16.) There is also undisputed evidence that Potts successfully blocked proposals by Rives, producing a deadlock and denying effective control to Rives. (*See* Defs.' Br. in Supp. Mot. Summ. J. Ex. 18, ECF No. 111.18.) Potts points to evidence that Rives was able to misappropriate Steel Tube's resources without his knowledge, but that is not evidence of control. Rather, if true, it shows the opposite, confirming that Rives was forced to circumvent the board to accomplish his goals.

27. For this reason, the Court need not and does not decide whether a non-majority shareholder exercising actual control over a corporation owes duties to other shareholders. Even if the North Carolina Supreme Court were to adopt this rule, Potts has not offered evidence of control sufficient to create an issue of fact for a jury. Accordingly, the Court grants the motion for summary judgment as to Potts's individual claims for breach of fiduciary duty and constructive fraud.

2. Derivative Claims

28. Potts's derivative claims for breach of fiduciary duty and constructive fraud are based on the duties of loyalty and due care that Rives owed to Steel Tube. *See* N.C. Gen. Stat. §§ 55-8-30, -42. As an officer and director, Rives was required to "discharge [his] duties in good faith, with due care, and in a manner [he] believe[d] to be in the corporation's best interests." *Raymond James Capital Partners, L.P. v. Hayes*, 248 N.C. App. 574, 577, 789 S.E.2d 695, 699 (2016). That much is undisputed.

29. Whether Rives honored his duties is another matter. At issue are a slew of allegedly self-interested transactions: (1) a $20,000 payment to Lazenby; (2) monthly withdrawals of $7,500, totaling $90,000; (3) a $62,875 distribution; (4) a transfer of $120,000 to Elite Tube; and (5) other transfers of money and equipment to Elite Tube.[2] (*See* Compl. ¶ 44.) For the most part, Rives does not dispute that these

---

[2] The amended complaint further alleges that Rives breached his fiduciary duties by executing the contract to permit KEL to manage Steel Tube's trucking and transportation services and by filing S corporation election forms that contained false information. (*See* Compl. ¶ 44.) In his opposition brief, Potts also contends that Rives improperly entered into a contract with XS Steel, another company in which Rives held an interest. (*See* Opp'n 7, 15–16, 19.) Rives, however, offers no argument as to these disputed transactions in either of his briefs. (*See* Br. in Supp. 12–17; Defs.' Reply Br. in Further Supp. Mot. Summ. J. 5–7, ECF No. 123 ["Reply Br."].) Accordingly, the Court does not address them.

transactions occurred. Rather, he argues that the evidence is insufficient, as a matter of law, to show that any of these actions amounted to a breach of his duties of loyalty and due care to Steel Tube. (*See* Br. in Supp. 13–16.)

30. The $20,000 payment to Lazenby presents a classic jury question. Rives concedes that he authorized the payment but argues that it was innocuous—a sum intended to compensate Lazenby for work he continued to perform for Steel Tube after selling his stock and stepping down as an officer. (*See* Dep. L. Rives 96:2–14.) But Lazenby has testified that the payment was not compensation. Rather, it was a payment toward Rives's purchase of Lazenby's stock. (*See* Lazenby Aff. ¶ 11.) Given this conflicting evidence, a jury must decide whether Rives used Steel Tube's funds to pay his own debt to Lazenby, and if so, whether that was a breach of Rives's duties of loyalty and due care.

31. It is also undisputed that Rives received a distribution of $62,875 and withdrew another $90,000. (*See* Dep. L. Rives 156:1–12, 175:5–7, 189:3–9.) Rives characterizes these payments as a salary or similar type of compensation. (*See* Br. in Supp. 12–13.) On that basis, he argues that Potts's claims are barred by *Fulton v. Talbert*, which holds that "contracts fixing the amount and method of paying compensation for services to be rendered [by a corporate officer] are not void or voidable *per se*." 255 N.C. 183, 184, 120 S.E.2d 410, 411 (1961).

32. *Fulton* is no bar here. For one thing, it is far from clear that the payments to Rives were "compensation for services to be rendered." In his affidavit and during his deposition, Potts testified that he refused to authorize a salary for Rives and that

he and Rives agreed *not* to take any distributions because Steel Tube wasn't in a financial position to make them. (*See* Potts Aff. ¶ 16; Dep. A. Potts 93:9–22.) If the jury credits Potts's testimony, it could reasonably conclude that Rives took more than $150,000 without authorization, for his own personal use, and not as compensation for anything he did on behalf of Steel Tube. *Fulton* does not address that situation.

33. Even if these transfers are properly characterized as compensation or salary, they would not be immune from challenge. There is a clear conflict of interest when an officer or director unilaterally decides to take a salary and then sets the amount without approval of the board or the shareholders. *See* N.C. Gen. Stat. § 55-8-30(a). As this Court recently observed, "[c]onflict-of-interest transactions between a corporation and its officers or directors have long been subject to special rules," including that the transaction must be fair to the corporation. *Ehmann v. Medflow, Inc.*, 2017 NCBC LEXIS 88, at *45 (N.C. Super. Ct. Sept. 26, 2017). Although *Fulton* directs courts not to second-guess the need for or amount of compensation duly authorized by a corporation's board, the case cannot "be fairly read to erode the underlying concept that a transaction between a corporation and its officer or director should be fair to the corporation." *Id.* (discussing *Fulton*). Potts has put forward evidence that Rives channeled more than $150,000 to himself without board approval and at a time when doing so could undermine Steel Tube's financial position. (*See, e.g.*, Potts Aff. ¶¶ 15(a)–(c), 16; Dep. A. Potts 51:8–14, 93:12–22.) The Court cannot conclude, as a matter of law, that these transactions were fair to Steel Tube.

34. With little explanation, Rives also argues that his withdrawal of $90,000 in $7,500 monthly installments was authorized as part of the Acceptor Management Agreement and that Steel Tube is bound by this arrangement because Lazenby signed the agreement while he was still an officer of Steel Tube. (*See* Reply Br. 5.) This argument is unpersuasive. The Acceptor Management Agreement purports to give Rives, or a company controlled by Rives, the authority to manage Steel Tube. (*See* Management Agrmt. 1.) By its plain terms, though, the agreement states that compensation for those services "will be set by budget annually." (Management Agrmt. 4.) Even assuming the Acceptor Management Agreement was binding on Steel Tube, there is no evidence showing that Steel Tube's board, or any other authorized party, approved an annual budget allowing Rives a salary under the terms of the agreement. And, as noted, Potts testified that he refused to allow a salary for Rives. (*See* Potts Aff. ¶ 15(b)–(c); Dep. A. Potts 38:1–40:25.) The relationship between the Acceptor Management Agreement and Rives's monthly withdrawals presents another question of fact.

35. The facts surrounding the transfer of $120,000 to Elite Tube are also disputed. Rives argues that Potts misunderstands the nature of the transaction. He contends that Steel Tube purchased a partial interest in a new tube bending machine, which became an asset of the company. (*See* Rives Aff. ¶ 7.) In opposition, Potts offers the affidavit of Todd Berrier, a manager of Elite Tube. Berrier testifies that Elite Tube treated the $120,000 transfer as a capital contribution made in the name of Rives's wife but intended for Rives's benefit. (Aff. Todd Berrier ¶¶ 6–8, ECF No.

119.33 ["Berrier Aff."]; *see also* Opp'n Ex. C4, ECF No. 125.3.)  Berrier also states that he and Rives never discussed having Elite Tube and Steel Tube share ownership of a tube bending machine.  (*See* Berrier Aff. ¶ 8.)  At this stage, the Court cannot credit Rives's account over Berrier's; rather, weighing the credibility of each is a task for the jury.  *See, e.g.*, *Moore v. Fieldcrest Mills, Inc.*, 296 N.C. 467, 470, 251 S.E.2d 419, 422 (1979).

36.  In a footnote, Rives argues that Potts has already fully recovered the $120,000 through a settlement with Elite Tube.  (*See* Br. in Supp. 14 n.1.)  He points to the well-established rule that a plaintiff is not entitled to a "double recovery" for the same loss or injury.  *Chemimetals Processing, Inc. v. Schrimsher*, 140 N.C. App. 135, 138, 535 S.E.2d 594, 596 (2000).  The record on this point is undeveloped, though, and it is unclear whether the settlement with Elite Tube resulted in a full recovery.  Potts acknowledges that he cannot obtain a second recovery for the amount obtained from Elite Tube, but he argues that his expert will testify to additional damages that may be recoverable from Rives.  (*See generally* Opp'n Ex. L1, ECF No. 125.15 ["Damages Report"].)  The Court therefore declines to grant summary judgment, albeit without prejudice to Rives's ability to seek appropriate relief before or during trial.

37.  To the extent Rives contends that the business judgment rule shields the $120,000 transfer to Elite Tube,[3] the Court disagrees.  The rationale for the business

---

[3] Rives concedes that the business judgment rule does not apply to any payments made to himself, (Br. in Supp. 16).  *See Ehmann*, 2017 NCBC LEXIS 88, at *45–46 ("While it may be appropriate for a fiduciary to negotiate in his own interest, it does not follow that he is entitled to the business judgment rule when doing so."); *see also Telxon Corp. v. Meyerson*,

judgment rule is that officers and directors should be able to make business decisions—whether good or bad—without "the hindsight of judicial second guessing." 1 Robinson on North Carolina Corporation Law § 14.06 (2018). In the usual case, it is presumed that the officer or director made his or her decision in good faith, and if that presumption goes unrebutted, the court should not disturb the decision, absent extraordinary circumstances. *See State v. Custard*, 2010 NCBC LEXIS 9, at \*56–57 (N.C. Super. Ct. Mar. 19, 2010). But these protections do not apply when the officer or director has an interest in the disputed transaction. *See Ehmann*, 2017 NCBC LEXIS 88, at \*45–46. Potts has put forward evidence, through Berrier's testimony, showing not only that Rives had a personal interest in Elite Tube but that he attempted to conceal that interest by placing it in his wife's name. (*See* Berrier Aff. ¶ 5.) Taking that evidence as true, the Court cannot conclude that the business judgment rule protects Rives's actions.

38. There are two other transactions, however, where the record is one-sided in Rives's favor. In his complaint, Potts objects to the transfer of a piece of equipment known as a roll former from Steel Tube to Elite Tube and to the payment of $2,550.00 to Steve Williams purportedly for Elite Tube's benefit. (*See* Compl. ¶ 41(b)–(c).) Rives has offered evidence showing that the roll former is and always has been an asset of Steel Tube and that the payment to Williams went toward creating a website for Steel Tube. (*See* Rives Aff. ¶¶ 7, 11.) Potts's opposition brief does not address either issue.

802 A.2d 257, 265 (Del. 2002) ("Like any other interested transaction, directoral self-compensation decisions lie outside the business judgment rule's presumptive protection, so that, where properly challenged, the receipt of self-determined benefits is subject to an affirmative showing that the compensation arrangements are fair to the corporation.").

The Court is unaware of any evidence related to the roll former other than Rives's evidence, and as to the payment to Williams, Potts testified that he had no knowledge of the matter. (*See* Dep. A. Potts 69:6–17.) It was incumbent on Potts to offer evidence to support his claims that these transactions were improper. He has not done so.

39. The Court therefore grants summary judgment as to the derivative claims for breach of fiduciary duty and constructive fraud to the extent those claims are based on the misuse of the roll former and the payment to Williams. In all other respects, the Court denies the motion as to these claims.

### B. Civil Conspiracy

40. Potts asserts his claim for civil conspiracy against Rives, Rives & Associates, and KEL. The claim is premised on an agreement to facilitate an underlying breach of fiduciary duty by Rives. (*See* Compl. ¶ 88.)

41. To the extent the Court has granted summary judgment as to the underlying breach, summary judgment is also appropriate as to the conspiracy claim. As discussed, Rives owed no fiduciary duty to Potts individually; thus, there can be no conspiracy to breach such a duty. Likewise, the evidence related to the use of the roll former and the payment to Williams is insufficient to establish a breach of any duties owed to Steel Tube, meaning those actions cannot support a claim for conspiracy either. *See Piraino Bros., LLC v. Atl. Fin. Group, Inc.*, 211 N.C. App. 343, 350, 712 S.E.2d 328, 333–34 (2011) ("Where this Court has found summary judgment for the defendants on the underlying tort claims to be proper, we have held that a plaintiff's claim for civil conspiracy must also fail.").

42. The Court denies the motion for summary judgment to the extent the conspiracy claim is based on the other alleged wrongdoing underlying Potts's derivative claim for breach of fiduciary duty. Rives and Rives & Associates invoke the doctrine of intracorporate immunity, contending that they are agent and principal and therefore cannot conspire with one another as a matter of law. (*See* Br. in Supp. 16–17.) As a general rule, this is true. *See Chrysler Credit Corp. v. Rebhan*, 66 N.C. App. 255, 259, 311 S.E.2d 606, 609 (1984). But courts have held that a conspiracy may exist "if independent third parties are alleged to have joined the conspiracy." *Robison v. Canterbury Vill., Inc.*, 848 F.2d 424, 431 (3d Cir. 1988); *see also AWP, Inc. v. Commonwealth Excavating, Inc.*, 2013 U.S. Dist. LEXIS 103881, at \*13–14 (W.D. Va. July 24, 2013); *Christie v. Borough of Folcroft*, 2005 U.S. Dist. LEXIS 21569, at \*21–22 (E.D. Pa. Sept. 28, 2005). Here, the alleged conspiracy includes KEL—an independent third party—in addition to Rives and Rives & Associates. Thus, intracorporate immunity does not apply, and the conspiracy claim may proceed to trial to the extent it is based on a breach of the fiduciary duties that Rives owed to Steel Tube.

C. <u>Conversion and Unjust Enrichment</u>

43. The claims for unjust enrichment and conversion are largely premised on the same facts that underlie the derivative claim for breach of fiduciary duty. (*See* Compl. ¶¶ 71, 74–75.) Rives offers no independent reason to dismiss these claims, instead reiterating his arguments as to the claim for breach of fiduciary duty. (*See* Br. in Supp. 21–22.) Thus, for the reasons discussed above, the Court grants

summary judgment as to the claims for conversion and unjust enrichment to the extent they are based on the use of the roll former and the payment to Williams but denies the motion as to these claims in all other respects.

## D. Fraud and Facilitation of Fraud

44. The fraud claim is based on an alleged promise by Rives not to authorize transactions by Steel Tube above $25,000 without Potts's consent. (*See* Compl. ¶ 59.) According to Potts, Rives never intended to keep that promise and quickly broke it, transferring large sums to himself and to companies owned by his family. (*See, e.g.*, Compl. ¶¶ 31, 32, 41.) Potts also alleges that Rives & Associates and KEL facilitated Rives's fraud. (*See* Compl. ¶ 94.)

45. Our appellate courts routinely identify five essential elements necessary for fraud: (a) a false representation or concealment of a material fact; (b) that was reasonably calculated to deceive; (c) that was made with intent to deceive; (d) that did in fact deceive (*i.e.*, was relied upon by the recipient of the misrepresentation); and (e) that resulted in damage to the injured party. *See Rowan Cty. Bd. of Educ. v. U.S. Gypsum Co.*, 332 N.C. 1, 17, 418 S.E.2d 648, 658 (1992). Facilitation of fraud requires a showing "(1) that the defendants agreed to defraud the plaintiff; (2) that defendants committed an overt tortious act in furtherance of the agreement; and (3) that plaintiff suffered damages from that act." *Neugent v. Beroth Oil Co.*, 149 N.C. App. 38, 53, 560 S.E.2d 829, 839 (2002).

46. Rives argues, first, that there is no evidence that he made the alleged promise. (*See* Br. in Supp. 19–21.) But Potts has testified that Rives did. As

described by Potts, each agreed "that either he or I could spend up to" $25,000, "[b]ut if it went over that amount, well, then both of us would agree on it." (Dep. A. Potts 31:10–12; *see also* Potts Aff. ¶ 10.) Potts's testimony is corroborated by that of Janice Hatchell, who stated that she witnessed a "handshake" or "gentlemen's agreement" along these lines in early 2015. (Dep. J. Hatchell 48:18–49:8, ECF No. 111.5; *see also* Aff. J. Hatchell ¶¶ 4, 5, ECF No. 119.21 ["Hatchell Aff."].) This evidence is sufficient to reach a jury even though, as Rives notes, there is no evidence of an agreement in the minutes of the February 2015 shareholder meeting or in a written shareholder agreement. (*See* Dep. L. Rives 197:10–19; Dep. A. Potts 43:11–45:9, 47:18–48:4, 49:4–11; *see also* Defs.' Br. in Supp. Mot. Summ. J. Ex. 16.)

47. Rives also argues, without elaboration, that there is no evidence that he made the alleged promise "under circumstances where it would be reasonable to infer that there was no intent that it be kept." (Br. in Supp. 19.) There is evidence, though, that around the time of the alleged promise, Rives had taken steps to give himself authority to act without Potts's consent. Rives testified, for example, that he thought Potts had "a history of giving up good business opportunities." (Dep. L. Rives 109:12–13.) In Rives's own words, he asked Lazenby to execute the Acceptor Management Agreement as "a contingency plan" that would permit him to exercise control of Steel Tube in the event Potts made poor business decisions. (Dep. L. Rives 109:18.) Rives concedes that he did not disclose this agreement to Potts. (*See* Dep. L. Rives 110:4–15.) From this evidence, a jury could reasonably infer that Rives took actions inconsistent with his promise to obtain Potts's consent for transactions over $25,000

and that he concealed those actions. As noted, there is also evidence that Rives began authorizing payments to himself or for his personal benefit shortly after making this alleged promise. Taken together, a jury could conclude from this evidence that Rives did not intend to keep his promise at the time he made it. *See, e.g.*, *Whitley v. O'Neal*, 5 N.C. App. 136, 139, 168 S.E.2d 6, 8 (1969).

48. For these reasons, the Court denies the motion for summary judgment as to the fraud claim. Rives offers no independent basis to dismiss the claim for facilitation of fraud, and the Court denies the motion as to that claim as well.

<u>E. Professional Negligence and Breach of Contract</u>

49. Potts asserts derivative claims for breach of contract and professional negligence against Rives & Associates. The claims are based on similar facts. As alleged, Rives & Associates knowingly prepared and filed false tax forms for Steel Tube, which did not correctly reflect the status of Rives's ownership interest in the company or the various payments that Rives made to himself and others. (*See* Compl. ¶¶ 81, 85.)

50. Rives & Associates begins by arguing that breach of contract is not a cognizable theory of recovery on these facts. (*See* Br. in Supp. 22–23.) This argument, only two sentences long, is not fully explained. Rives & Associates cites two cases addressing medical malpractice claims, one of which states that "North Carolina does not recognize breach of contract as a legal theory under which one can recover for negligent malpractice." *Lackey v. Bressler*, 86 N.C. App. 486, 491, 358 S.E.2d 560, 563 (1987). There is no additional reasoning on that point in *Lackey*, and the Court

is not aware of any case law applying it outside the medical malpractice context. At least one court has suggested that the purpose of *Lackey*'s statement is to deter plaintiffs from alleging a claim based on an implied contract as a way to circumvent the special rules that apply to medical malpractice cases. *See Estate of McIntyre v. Transitional Health Servs., Inc.*, 1998 U.S. Dist. LEXIS 13965, at *13 (M.D.N.C. May 20, 1998) (denying motion for summary judgment as to claim based on an express contract).

51. Based on the limited briefing and record related to this issue, the Court concludes that summary judgment is inappropriate. This is not a medical malpractice case, and there is no concern that Potts's contract claim is an end run around the rules designed for those cases. In addition, neither party has explained whether the alleged contractual relationship between Steel Tube and Rives & Associates is express or implied. If the evidence at trial shows that the duties owed by Rives & Associates to Steel Tube all derive from the common law as opposed to an express contract, it may be inappropriate to submit two claims, rather than one, to the jury. How to address that situation is a discussion better left to the pretrial hearing or at trial. For now, the Court declines to dismiss the claim for breach of contract.

52. Next, Rives & Associates argues that Potts cannot recover, under any theory, for misrepresentations made on Steel Tube's S corporation election form. That form was prepared in the spring of 2015 but backdated to October 1, 2014, before Rives acquired Lazenby's stock. (*See* Potts Aff. ¶ 13; Rives Aff. ¶ 5.) Its purpose was

to convert Steel Tube from a tax-paying corporation to a pass-through corporation, such that Steel Tube's losses would be reported on Potts and Rives's individual tax returns and provide them with personal tax benefits. (*See* Damages Report 16; Rives Aff. ¶ 5.) Potts's evidence suggests that the election was eventually declared invalid because the paperwork was not signed by Lazenby, who was a shareholder of Steel Tube on the effective date. (*See* Borden Aff. ¶ 4.) The invalid election, Potts argues, has resulted in fees, interest, and penalties. (*See* Borden Aff. ¶¶ 6–8.)

53. In seeking summary judgment, Rives & Associates cites the doctrine of *in pari delicto*, "which prevents the courts from redistributing losses among wrongdoers." *Whiteheart v. Waller*, 199 N.C. App. 281, 285, 681 S.E.2d 419, 422 (2009), *disc. rev. denied*, 36 N.C. 813, 693 S.E.2d 353 (2010). In short, Rives & Associates says Potts lost any right to seek damages for the S corporation election because he voluntarily signed the form and was therefore at least equally at fault. (*See* Br. in Supp. 23.)

54. Potts objects on procedural grounds, arguing that Rives & Associates should have, but did not, assert *in pari delicto* as an affirmative defense in its answer. (*See* Opp'n 21.) Our Supreme Court has stated that "[f]ailure to raise an affirmative defense in the pleadings generally results in a waiver thereof." *Robinson v. Powell*, 348 N.C. 562, 566, 500 S.E.2d 714, 717 (1998). But the Supreme Court has also "permitted affirmative defenses to be raised for the first time by a motion for summary judgment," so long as the opposing party has a full and fair opportunity to present argument and evidence on the issue. *See id.* at 566–67, 500 S.E.2d at 717

(citing *Dickens v. Puryear*, 302 N.C. 437, 441, 276 S.E.2d 325, 328 (1981)); *see also Williams v. HomeEq Servicing Corp.*, 184 N.C. App. 413, 425, 646 S.E.2d 381, 388–89 (2007). Potts had the opportunity to brief the issue, to offer evidence, and to present oral argument. Thus, it is appropriate to consider the *in pari delicto* defense even though Rives & Associates did not plead it as an affirmative defense.[4]

55. On the merits, Rives & Associates has not shown that the doctrine of *in pari delicto* bars Potts's claim as a matter of law. "[T]he *in pari delicto* defense traditionally has been narrowly limited to situations in which the plaintiff was *equally* at fault with the defendant." *Skinner v. E.F. Hutton & Co.*, 314 N.C. 267, 272, 333 S.E.2d 236, 240 (1985) (emphasis in original); *see also Zloop, Inc. v. Parker Poe Adams & Bernstein, LLP*, 2018 NCBC LEXIS 16, at \*16–17 (N.C. Super. Ct. Feb. 16, 2018) (the defense "operates to bar a plaintiff's claims when the plaintiff is at least equally at fault with the defendant and the allegedly wrongful conduct complained of is the subject of the lawsuit"). Potts has alleged that Rives & Associates intentionally prepared an S corporation election form that falsely backdated Rives's ownership so that Rives could claim Steel Tube's losses in 2014 on his own personal tax return that he was not, in fact, entitled to claim. (*See* Opp'n 4–5, 17–18; Potts Aff. ¶ 13.) Potts has also alleged that he relied on the advice of Rives, a tax professional, in deciding to sign the form. Even if it is true that Potts should have known that the election form contained incorrect information, a jury could fairly conclude from this evidence

---

[4] In its reply brief, Rives & Associates expands its argument beyond *in pari delicto* to contributory negligence. (*See* Reply Br. 8–9.) Because that argument appears for the first time in the reply brief, Potts did not have the same opportunity to provide evidence or to respond through briefing, and the Court therefore does not consider that argument.

that Potts's negligence was less culpable than Rives & Associates's intentional misrepresentations, made for Rives's personal gain. Summary judgment is not appropriate as to the S corporation election.

56. Finally, Rives & Associates denies preparing and filing an allegedly false 1099-Misc form indicating that Rives's monthly $7,500 withdrawals were payments to Rives & Associates, rather than to Rives. The evidence in support of the motion for summary judgment includes a 1096 form and two 1099-Misc forms, neither of which relates to the monthly withdrawals. (*See* Rives Aff. Ex. 3.) Rives also testifies that the allegedly false 1099-Misc form was never actually filed. (*See* Rives Aff. ¶ 9.) The opposition brief does not address this issue, and the Court is not aware of any evidence tending to show that the disputed form was filed. Hatchell testified, for example, that she did not know whether the form was ever issued. (*See* Dep. Hatchell 77:11–13.) In the absence of any evidence showing the form was actually prepared and filed by Rives & Associates, Potts cannot demonstrate any breach of contract or professional negligence resulting from it.

57. The Court therefore grants the motion for summary judgment as to the claims for professional negligence and breach of contract against Rives & Associates to the extent the claims are based on the 1099-Misc form but denies the motion as to these claims in all other respects.

### F. Removal of Director

58. Rives moves for summary judgment on Potts's claim seeking Rives's removal as a director. The parties acknowledge that Rives is no longer a director and agree

that the claim for his removal is moot. (*See* Br. in Supp. 22; Opp'n 24.) Accordingly, the Court grants summary judgment as to this claim and dismisses the claim as moot.

IV.
CONCLUSION

59. For the reasons set forth above, the Court, in exercise of its discretion, **GRANTS** in part and **DENIES** in part the motion.

    a.    The Court **GRANTS** the motion for summary judgment as to the claims for breach of fiduciary duty and constructive fraud to the extent that they are brought in Potts's individual capacity. The claims are **DISMISSED** with prejudice.

    b.    The Court **GRANTS** the motion for summary judgment as to the derivative claims for breach of fiduciary duty and constructive fraud to the extent those claims are based on the misuse of the roll former and the payment to Williams. The Court **DENIES** the motion for summary judgment as to these claims in all other respects.

    c.    The Court **GRANTS** the motion for summary judgment as to the claim for civil conspiracy to the extent the claim is based on the individual claims for breach of fiduciary duty and constructive fraud, the misuse of the roll former, and the payment to Williams. The Court **DENIES** the motion for summary judgment as to the claim for civil conspiracy in all other respects.

    d.    The Court **GRANTS** the motion for summary judgment as to the claims for conversion and unjust enrichment to the extent those claims are based on the

misuse of the roll former and the payment to Williams. The Court **DENIES** the motion for summary judgment as to these claims in all other respects.

e.     The Court **DENIES** the motion for summary judgment as to the claims for fraud and facilitation of fraud.

f.     The Court **GRANTS** the motion for summary judgment as to the claims for professional negligence and breach of contract as asserted against Rives & Associates to the extent based on the disputed 1099-Misc form. The Court **DENIES** the motion for summary judgment as to these claims in all other respects.

g.     The Court **GRANTS** the motion for summary judgment as to the claim for removal of Rives as a director of Steel Tube. This claim is **DISMISSED** as **MOOT**.


     **SO ORDERED**, this the 9th day of May, 2019.


                         /s/ Adam M. Conrad
                         Adam M. Conrad
                         Special Superior Court Judge
                          for Complex Business Cases